**THE ROSEN LAW FIRM, P.A.**
~~Phillip Kim, Esq. (PK-9384)~~
Laurence M. Rosen, Esq. (LR 5733)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and Class

<div align="center">

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

</div>

| | | |
|---|---|---|
| CHUN YU WONG, JOHN SELLARS, AND ROYCE OELSCHLAGER INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) | Case no.: 07-CV-3230 (PAC) |
| Plaintiff, | ) ) ) | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| vs. | ) ) | **JURY TRIAL DEMANDED** |
| MEDIS TECHNOLOGIES LTD., ROBERT K. LIFTON, and ANDREW UDIS, | ) ) ) | |
| Defendants. | ) ) ) ) | |

Lead Plaintiffs Chun Yu Wong, John Sellars, and Royce Oelschlager (the "Plaintiffs"),

individually and on behalf of all other persons similarly situated, by their undersigned attorneys,

allege for this First Amended Complaint (the "Complaint") the following upon knowledge, with

respect to their own acts, and upon facts obtained through an investigation conducted by their

counsel, which included, *inter alia*, (a) review and analysis of relevant filings made by Medis

Technologies, Ltd. ("Medis" or the "Company") with the United States Securities and Exchange

<div align="center">1</div>

Commission (the "SEC"); (b) review and analysis of Defendants' public documents, conference calls and press releases, (c) review and analysis of securities analysts' reports and advisories about the Company, and (d) information readily obtainable on the internet. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action on behalf of themselves and all other persons or entities (the "Class") who purchased the common stock, call options, and/or sold put options of Medis for the time period April 13, 2007 through April 17, 2007, inclusive and who were damaged thereby. Plaintiffs seek to recover damages caused by Defendants' violation of Sections 10(b) and Rule 10b-5 thereunder, and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Medis is a development stage company that is primarily in the business of developing a portable fuel cell recharger for portable consumer electronics, such as cell phones, PDAs, and MP3 players—called the 24/7 PowerPack ("PowerPack"). In its history, Medis has never earned any material revenues from the sale of PowerPacks.

3.      Early on the morning of April 13, 2007 the Company announced that it had begun "commercial sales" of its PowerPacks to Microsoft and that it had made its "first" shipment of "Microsoft-Branded" PowerPacks to Microsoft. The Company's CEO, Robert K. Lifton ("Lifton"), called the event an historic moment.

2

4.     Given the undisputed prowess of the Microsoft brand and Microsoft's apparent validation of the quality and utility of Medis' PowerPacks demonstrated by Microsoft's selling Medis' products as "Microsoft branded" PowerPacks to consumers, the investing public reacted positively to this material information.

5.     This announcement caused the Company's stock to trade to an intraday high on April 13, 2006 of $24.10 per share, up nearly $5.81 from its previous closing price of $18.29 per share, on extremely heavy volume.  The Company's stock eventually closed the day at $20.32 per share, up $2.03.

6.     Moreover, market commentators and journalists also took notice of the Company's announcement.  For example, on April 13, 2007 *Marketwatch* columnist Herb Greenberg contacted Medis for more specific information as to the quantities involved, the nature of the sales, and any other details.  In his column, Mr. Greenberg raised certain doubts as to the significance of Medis' "commercial sales" as no details were released by the Company.

7.     Later on April 13, 2007, in an apparent response to the doubts raised by Mr. Greenberg and other market commentators and journalists, defendant Andrew Udis ("Udis"), the Company's Business Development Manager, provided an exclusive interview with technology trade publication *Inside Greentech*. ("*Greentech*").  In an article published by *Greentech*, Udis is quoted as stating that the expected unit commitment from Microsoft was "in the millions."  He is also quoted as saying that Microsoft had branded the PowerPacks and planned to sell them around the world.  The *Greentech* article also described Microsoft as Medis' "OEM Partner".

8.     The statements made by the Company about its "commercial sales" to Microsoft on April 13, 2007, however, were materially false and misleading as Microsoft had never branded the

Medis PowerPack, and did not intend to sell it to customers, but had merely ordered less than $15,000 worth of them to give away for free as novelties at trade shows, as is commonly done with Frisbees, pens, and t-shirts. The claim that Medis expected Microsoft to order millions of PowerPacks for sale world-wide was a complete falsehood.

9.     On April 17, 2007, after market-close, information began to enter the market demonstrating that: (a) Microsoft had no plans to sell the Company's PowerPacks around the world—let alone to any consumer, but rather intended to give the units away at an upcoming event— essentially as party favors or "trade show freebies"; (b) there would be no "Microsoft branded" PowerPack sold to consumers; (c) the unit commitment from these orders was for a total purchase price of less than $15,000; (d) Microsoft had no intention of developing the PowerPack nor had such intentions to do so jointly with the Company; (e) there were <u>no</u> agreements between Microsoft and Medis; and (f) there were no partnerships between Medis and Microsoft around accessories or anything else.

10.     This adverse news, which directly contradicted Medis' prior positive statements, caused the Company's stock to fall approximately $2.08 per share on April 18, 2007 through April 20, 2007, a drop of nearly 11%.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

13.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Defendant maintains its principal executive offices in this District and many of the acts and transactions alleged herein, including the preparation and dissemination of statement containing materially false and misleading information and omissions of material fact, occurred in substantial part in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

15.     Lead Plaintiffs Chun Yu Wong, John Sellars, and Royce Oelschlager purchased and/or sold Medis securities during the Class Period and have suffered damages thereby.  Plaintiffs' certifications, previously filed with the Court, are incorporated herein.  By Order of the Court, dated July 16, 2007, Plaintiffs were appointed as Lead Plaintiffs, pursuant to Section 21D of the Exchange Act 15 U.S.C. §78-u4.

16.     Defendant Medis is a Delaware Corporation, with its principal executive offices located at 805 Third Avenue, New York, New York 10022.

17.     Medis, through its wholly owned operating subsidiaries, is focused primarily on the design, development, and marketing of a liquid fuel cell product for mobile handset and portable consumer electronics markets—the 24-7 PowerPack (the "PowerPack").   According to the Company's website (http://www.medistechnologies.biz.), the PowerPack, along with the Company's

power management system, purports to be the "world's first consumer fuel cell" power system designed to provide power for portable devices, such as cell phones, PDAs and MP3 players.

18.    Prior to the Company's focus on the development of the PowerPack, the Company had been primarily engaged in the medical device industry through a wholly owned operating subsidiary.

19.    At all relevant times herein, the Company's common stock was listed on the NASDAQ Global Market under the ticker "MDTL".

20.    Defendant Robert K. Lifton ("Lifton"), at all relevant times herein, served as the Chairman and Chief Executive Officer ("CEO") of the Company.  According to the Company's website, Lifton has held those positions since the Medis' inception.

21.    Defendant Andrew Udis ("Udis"), at all relevant times herein, served as the business development manager for the Company.  Udis has also been referred to as Medis' marketing representative in various Company filings with the SEC.  For example, in an exhibit to a Form 8-K filed with the SEC on June 1, 2006, Lifton refers to Udis as visiting the Far East on behalf of the Company to distribute its PowerPack products there.  Udis and Lifton have been "friends for years" according to media reports issued by David Redstone and his investment newsletter Hydrogen and Fuel Cell Investor.

22.    Lifton and Udis are collectively referred to herein as the "Individual Defendants."

23.    Each of the Individual Defendants directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business and operations as alleged herein.  Said Defendants were involved in drafting, producing, reviewing

and/or disseminating the false and misleading statements and information alleged herein, were aware of or recklessly disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

24.    As officers, directors and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded stock would be based upon truthful and accurate information.

25.    Medis is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were done within the scope of their employment with authorization.

26.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Medis under *respondeat superior* and agency principles.

27.    In addition, Defendants are liable for the statements concerning the PowerPack published by other news sources because Defendants knowingly provided false statements to these news outlets for the purpose of having the false and misleading information disseminated to the investing public and be relied upon by the investing public in its determinations of whether to purchase and sell Medis securities.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

28.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased common stock, call options, and/or sold put options of Medis securities during the Class Period and who were damaged thereby.   Excluded from the Class are Defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Medis' securities were actively traded on the NASDAQ Global Market, where more than 5 million shares of Medis stock were traded during the Class Period.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.  According to the Company's Annual Report filed on Form 10-K with the SEC on March 15, 2007, the Company had 34,939,364 shares outstanding as of March 12, 2007.  Members of the Class may be identified from records maintained by Medis or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

30.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

32.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, prospects, sales, operations and management of Medis; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

34.    The Class Period begins on Friday, April 13, 2007, when the Company issued a materially false and misleading  press release, and later filed a corresponding 8-K with the SEC, entitled "MEDIS TECHNOLOGIES BEGINS COMMERCIAL SALES OF ITS FUEL CELL 24/7 POWER PACK."  The press release states in relevant part:

Friday April 13, 10:02 am ET,   NEW YORK, NY - APRIL 13, 2007 - MEDIS
TECHNOLOGIES LTD. (NASDAQ:MDTL) announced that it has  begun  commercial

sales of its 24/7 fuel cell Power Packs to Microsoft. The first shipment of **Microsoft branded** 24/7 Power Packs were made today.

> "This is an historic moment for our company," said Robert K. Lifton, Chairman and CEO of Medis Technologies. "It marks the first commercial sales of our 24/7 Power Pack product and indeed, the first commercial sales in quantities of any consumer fuel cell product. We are pleased to be able to serve Microsoft as our first customer."[1]

35.    This "historic" announcement was material as it related to the Company's lead product and caused the Company's stock to rise dramatically on April 13, 2007 from a previous closing price of $18.29. On April 13, this announcement caused the Company's stock to rise to an intraday high of $24.10 per share and closed the day up $2.03 per share, or 11%, at $20.32 per share—on nearly 3.5 million shares traded. On April 12, 2007, only about 175,000 of the Company's shares traded hands.

36.    Following the large upward price movement caused by the April 13th announcement that Microsoft's intended to enter the fuel cell business with Medis' "first" shipment of "Microsoft branded" PowerPacks, and Defendant Lifton's proclamation that the order was "historic," several market commentators began to raise questions about the actual significance of the Company's announcements.

37.    During the trading day on April 13, 2007, Herb Greenberg of *Marketwatch* announced that he had contacted Defendant Lifton and Microsoft for specific details of the Microsoft commercial sales, as evidenced by Mr. Greenberg's *Marketwatch* internet column. The internet column states in relevant part:

> Have been jammed today, but for those wondering: I have a call into Medis Technologies (mdtl) CEO Bob Lifton today about his company's press release that said Microsoft is the first commercial customer for its cell phone/electronic device recharger to Microsoft. Lifton always takes my call, though he considers me the "enemy," so we'll see if he does this time.

---

1 A copy of the April 13, 2007 press release is attached hereto as Exhibit 1.

The press release, which got the stock juiced by more than 30% at one point, said the products bear a Microsoft brand. Lifton was quoted as saying, "We are pleased to be able to serve Microsoft as our first customer." **However, there were no other details about the size of the sale, potential contribution to profits or even what Microsoft might use this fuel-cell product for.** I also have a call into Microsoft, for confirmation; a spokeswoman says the company will try to track it down. (*emphasis in original*).[2]

38.    Also on April 13, 2007, the Company's Deputy Chairman/COO/Treasurer and longtime friend of Defendant Lifton, Howard Weingrow, was contacted by the investment research website Citron Research ("Citron") for more information on the "Microsoft branded" PowerPacks.

39.    According to Citron, when asked about the particular size of the transaction and for a contact person at Microsoft, Mr. Weingrow informed Citron that he did not have the purchase order in front of him and thus, could not respond to Citron's questions, despite the fact this was the Company's "historic" first sale. Citron's remarks cast doubts about the Company's April 13, 2007 announcement. The Citron article states in relevant part:

Dear Reader,

Citron Research calls into serious question the press release distributed today by Medis Technologies (NASDAQ:MDTL) regarding the sale of product to Microsoft. We are not fully ready to declare this a fraud yet, but here are the clues that tell us that something is very wrong with today's press release:

We called Medis Technology and spoke to Deputy Chairman/COO/Treasurer Howard Weingrow. When asked how much the sale was for and the name of a contact at Microsoft, he responded that he did not have the purchase order in front of him and could not answer those questions. This is supposed to be the company's first sale, yet the COO does not even know how much the sale was for.

The press release did not name a contact person or even a group at Microsoft and contained no quote from a Microsoft representative.

The usual Microsoft Corp. trademark identifiers were missing.
The press release said "delivery" but when did they sign the contract? The same day ?

_____

2 A copy of Mr. Greenberg's April 13, 2007 internet column is attached hereto as Exhibit 2.

In the past Medis has put out press releases regarding sales that have never occurred. http://www.medistechnologies.com/news.php?op=a&id=46

The two people we spoke to in Microsoft's corporate communications did not know about this press release. We will keep you updated on any developments.

We note that Medis has reported less than $1 million in revenue in the entire span of the last five years. During that time the share count has increased over 41%. We guess $664 million (market cap) just doesn't buy what it used to…..

It is the opinion of Citron that there is a lot more to this story. We have been promised a product for years, and instead we have a long trail of nothing more than broken promises from management. If this press release is true, than it is time for the company to step up with confirmation and disclosure of the material details.³ *See also* ¶¶ 51-62, *infra.*

40.    In an apparent response to the questions posed by these and other market commentators and journalists, on April 13, 2007 defendant Udis provided an exclusive interview with the California-based technology trade publication *Inside Greentech* ("Greentech"). The *Greentech* article, entitled "Microsoft to Sell Fuel Cells," reported that the Microsoft sale announced earlier that day was "a small purchase" for Microsoft. However, defendant Udis confirmed that Microsoft intended to offer the devices to the public and that "[Microsoft] branded the product and plan to sell these around the world." Udis is also quoted as saying that the unit commitment from Microsoft was expected to be "in the millions." The article states in relevant part:

> **Microsoft to sell fuel cells**
>
> By Dallas Kachan
> Published April 13, 2007 - 12:00pm
>
> Microsoft is to soon start offering a fuel cell-based power pack product for powering personal electronics, its OEM partner revealed today.
>
> Medis Technologies of New York (NASDAQ: MDTL) said it has delivered its first shipment of special Microsoft-branded versions of its Direct Liquid Fuel Cell (DLFC)-based "24/7 Power Pack" product.

---

3 A copy of the Citron article is attached hereto as Exhibit 3.

While the company wouldn't specify the quantity of the initial shipment, or of the contract's total volume, **business development manager Andrew Udis told Inside Greentech the ultimate unit commitment was expected to be "in the millions."**

A Microsoft spokesperson would only acknowledge that the company made "a small purchase" from Medis, **but Udis confirmed Microsoft intends to offer the devices to the public.**

**"They've branded the product and plan to sell these around the world."**

Shares of Medis were up $2.60 today, almost 15%, trading at $20.99.
"This is an historic moment for our company," said Robert K. Lifton, Chairman and CEO of Medis, in a statement.

"It marks the first commercial sales of our 24/7 Power Pack product and indeed, the first commercial sales in quantities of any consumer fuel cell product. We are pleased to be able to serve Microsoft as our first customer."

The Microsoft deal may be the first, but Medis' Udis told Inside Greentech other companies have come forward with volume orders for its 24/7 Power Pack.

<div align="center">*    *    *    *</div>

Udis said Medis was also "talking to all the leading mobile operators in the U.S., Europe and Asia and other OEMs."

The first Power Packs for Microsoft were produced on Medis' semi-automated line. A fully automated line, which was built by Ismeca in Switzerland, is in the process of being dismantled and shipped to Ireland where it's to be managed by contract manufacturer Celestica. (*emphasis added*)[4]

41.    The interview and article were conducted and written by *Greentech's* publisher and Acting Editor, Dallas Kachan. Udis knew at the time he made the materially false and misleading statements to Mr. Kachan that his statements would be publicly disseminated to the investing public and acted upon in determining whether or not to purchase and sell Medis securities.

42.    The statements made by Medis in its April 13, 2007 announcements were materially false and misleading because (a) Microsoft had no plans to sell Medis' PowerPacks around the

<div align="center">13</div>

world—let alone to any consumer. Rather, the "historic" "commercial sales" were to be used by

Microsoft as a free giveaway at an "upcoming event"—essentially as a party favor; (b) there would

be no "Microsoft branded" PowerPack, (c) nor would Microsoft sell any PowerPacks to consumers

or anyone else; (c) the unit commitment from Microsoft was for a total purchase price of less than

$15,000; (d) Microsoft had no intention on developing the PowerPack or any intentions to engage in

any joint business activity with Medis; (e) no agreements between Microsoft and Medis existed; (f)

Medis was not an OEM (original equipment manufacturer) for Microsoft; and (g) no partnership

around accessories or anything else existed—all evidenced by the following:

> Microsoft says it has no plans to sell fuel cell chargers
> By John Letzing Last Update: 4:29 PM ET Apr 17, 2007
>
> SAN FRANCISCO (MarketWatch) -- Despite recent media reports, **Microsoft Corp. has no plans to sell fuel cell products capable of re-charging portable electronic devices, according to a company spokeswoman.** On Friday a company called Medis Technologies Ltd. announced it had sold an unspecified amount of its fuel cell chargers to Microsoft, but offered no further details. Media reports appeared soon afterward, speculating that the chargers may be intended for re-sale by Microsoft to accompany its Zune portable media device. **The Microsoft spokeswoman said only that a "small amount" of the chargers was purchased, to be distributed for free at an upcoming event. Microsoft is "not planning to sell them to consumers," the spokeswoman said.**[5]

43.     A similar article, providing additional information, was later posted by Mr. Greenberg

of *Marketwatch* on April 17, 2007.  The article states in relevant part:

> Updated: Microsoft Comments on Medis: 'Like a Frisbee'
>
> I see that MarketWatch's John Letzing beat me to the punch -- scooped me on my own story! -- regarding Microsoft's (msft) comments **that it has no plans to sell fuel cell chargers from Medis Technologies (mdtl)**. (Nice job, John.) The skimpy Medis press release last Friday, about the Microsoft deal, gave no detail, but helped goose the stock. In subsequent

---

4 A copy of the Inside Greentech article is attached hereto as Exhibit 4.
5 A copy of the John Letzing's April 17, 2007 *Marketwatch* article is attached hereto as Exhibit 5.

interviews, Medis executives pumped up the importance of the deal. Business development manager **Andrew Udis went so far as to tell the publication, Inside Greentech, that the Microsoft commitment was expected to be "in the millions" and that Microsoft intends to offer its fuel cell to the public. "They've branded these products and plan to sell these around the world," Udis was quoted as saying.**

Now hear this: A Microsoft spokesman, noting that the order was "small," told me there has been **"inaccurate" information in the marketplace about what Microsoft plans to do with the fuel cells. "We have no plans to resell these products around the world," she said. She added that Microsoft has no plans "for development of the product."**

Then what is Microsoft doing with it? As John says in his piece, Microsoft plans to use the Medis products as a giveaway at an upcoming event...like a chatchke. Yet another Medis announcement that isn't quite what it appears to be.

Update -- this just in: Glass Lewis, the proxy and research firm, reports added color in a report to its clients. **It quoted a Microsoft spokesman as saying the Medis product is "not a Microsoft branded product." He added that the total purchase price was "less than $15,000. We have no agreements with them. No joint development. There's no partnership around accessories. If you think of this as akin to Microsoft buying a pen or a Frisbee -- that's the way you should think of it."** That's pretty much confirms what I got in a "background" conversation with Microsoft. (*emphasis added*)[6]

44.     The Company's first April 13th announcement was also independently materially false and misleading as it conveyed to the investing public that "commercial sales" to Microsoft were in significant quantities, would be a source of a significant and continuous revenue stream, and that Microsoft would resell the products to consumers. Company CEO Lifton called the order "historic" and the "first commercial sales in quantity of any consumer fuel cell product." Moreover, the same announcement states that the Company had "begun commercial sales" to Microsoft and made its "first shipment" of "Microsoft branded" PowerPacks.

---

6 A copy of the Mr. Greenberg's internet posting is attached hereto as Exhibit 6.

45.     As demonstrated by the April 17, 2007 announcements above, such statements were materially misleading.  Moreover, the "commercial sales" to Microsoft did not exceed $15,000 and were essentially party favors that Microsoft was to give away free at an "*upcoming event*."

46.     By stating that the PowerPacks were "Microsoft branded" in the Company's first April 13, 2007 announcement and later reiterating that statement in the second April 13, 2007 announcement, yet failing to disclose the products were not to be resold to consumers but rather be given away free as party favors at an event, the Company materially misled the investing public to believe that Microsoft was reselling Medis' PowerPacks to consumers under its own name as a Microsoft branded product.

47.     Moreover, if Microsoft had sold the PowerPacks to consumers under its own name (which it did not), rather than giving them away as party favors at an event, Microsoft's brand name and reputation would have stood behind the quality and reliability of Medis' PowerPacks and would have acted to validate the PowerPack and technology.

48.     The "Microsoft" brand name is one of the most admired and valuable names in the world.  In 2007, it was named the world's number three "Most Powerful Brand", behind Google and General Electric, according to a report issued by international brand marketing and strategy consulting firm Millward Brown.

49.     The quoted statements by Udis in the *Inside Greentech* article were materially false and misleading as Udis claimed that the unit commitment from Microsoft was expected to be in the millions, that Microsoft was going to resell the PowerPacks around the world, and planned on developing the PowerPacks, as demonstrated by the April 17, 2007 announcements.

50.     These statements by Udis were intentionally false.  Udis, as Business Development Manager for the Company, at all relevant times was charged with creating sales for the Company's PowerPack products.  His compensation was directly tied to the Company's sales.  Udis is entitled to 1% of the actual completed sales on his accounts.  Thus, Udis was fully aware of the terms of the Microsoft sale when he made his statements to *Greentech*.

## ADDITIONAL ALLEGATIONS DEMONSTRATING SCIENTER

51.     The fact the Company has a demonstrated historical pattern and practice of failing to be forthright in its disclosures to investors further supports an inference of scienter.

52.     The Company has on numerous occasions told the investing public that its PowerPack may lawfully be carried onto planes.  During an investor conference call on May 9, 2007,[7] in response to a question about whether one can carry a Power Pack on a plane, Lifton falsely stated that Power Packs can be lawfully carried on airplanes. Lifton stated in relevant part:

> **<A - Robert Lifton>**: Let me comment on the whole subject, ….**there is absolutely no legal or moral or any reason that it should not be able to be brought on an airplane.** …
> Our people, and people, and including the persons from – who did the review on MyTreo.net and elsewhere, have literally carried hundreds and hundreds of Power Packs onto airplanes and have never been stopped. *(emphasis added)*[8]

53.     The PowerPacks contain sodium/potassium borohydride which are/is a Class 8 hazardous material and such materials are prohibited to be carried on commercial airplanes.

54.     Lifton's statements are materially misleading as there was no approval for PowerPacks to be transported and/or carried on U.S. commercial airplanes.

---

7 A copy of the May 9, 2007 conference call transcript is attached hereto as Exhibit 7.
8 *Id.* at p. 5.

55.     According to the Pipeline and Hazardous Materials and Safety Administration of the U.S. Department of Transportation, as of April 19, 2007, Medis has a pending petition for a special permit to amend 49 CFR 175.10(a) to: "authorize passengers and crewmembers on aircraft to carry on baggage containing micro fuel cell systems with a small quantity of sodium/potassium borohydride solution, a Class 8, PG II liquid and a small quantity of potassium hydroxide electrolyte solution, a Class 8 PG liquid."[9] No decision on the petition has been made, nor could such a decision have been made by May 9, 2007 when Lifton made his materially misleading comments above.

56.     Moreover, the statements by Lifton on May 9, 2007 effectively encouraged and endorsed the violation of federal regulations, which is probative of scienter. Moreover, the fact the Company has been attempting to have the applicable Code of Federal Regulations amended to allow PowerPacks on domestic U.S. flights since at least August 23, 2006 is further probative of scienter.[10]

57.     On July 28, 2005 the Company announced that it had received a whopping $50 million purchase order from an entity named ASE International.[11] The $50 million "order" was issued for delivery of 200,000 PowerPacks per month for the first year of availability from Medis' production and 400,000 units the second year of production.

58.     This July 28, 2005 announcement caused Medis' stock price to shoot up almost $3.00 per share to a high of $18.18/share before closing at $18.71/share, on volume three and half times the previous day's trading.

---

9 A copy of the federal register print-out from the Department of Transportation website is attached hereto as Exhibit 8.
10 A copy of Medis' petition to amend the Code of Federal Regulation dated August 23, 2006 is attached hereto as Exhibit 9.
11 A copy of the July 28, 2005 announcement is attached hereto as Exhibit 10.

59.     Medis, however, failed to disclose in the press release that the purported customer, ASE International, was owned and controlled by Andrew Udis' father-in-law.

60.     Later that day and the next, questions were raised on investor message boards as to the legitimacy of ASE International and the $50.0 million purchase order. On July 29, 2005, after these concerns were aired, Medis' stock price dropped back down its previous level.

61.     Medis never disclosed that ASE International was owned and controlled by Udis' family until an investor conference call on August 4, 2005, when Lifton finally admitted that the Chairman and CEO of ASE International and its affiliate Sheralaven Enterprises is the father-in-law of Defendant Udis.

62.     As an epilogue, the ASE International purchase order has never been filled and Medis has earned no revenue from it since it was announced more than two years ago.

## THE FRAUDULENT STATEMENTS CAUSED PLAINTIFFS' LOSSES

63.     The false and misleading statements issued by Medis on April 13, 2007 concerning its business arrangement with Microsoft caused Medis' stock price to increase 11% to $20.32 per share on trading volume 20 times greater than the previous day.

64.     On April 17, 2007 after-market close, the adverse announcements (described above) were issued by *Marketwatch* and Mr. Greenberg revealing that: (a) Microsoft had no plans to resell the Company's products to consumers—let alone around the world; (b) Microsoft was not "branding" the PowerPacks; (c) the Company's "PowerPacks" were to be given away free by Microsoft as a sort of party favor at an upcoming event; (d) Microsoft had no plans to develop

PowerPacks by itself or jointly with the Company; and (e) there would be no partnerships between the Company and Microsoft.

65.     These corrective disclosures caused the Company's stock price to drop. On April 18, 2007 the Company's stock closed at $17.97/share, down $1.53/share on over 1,135,000 shares traded. The Company's stock continued its downward slide and on April 19, 2007 and April 20, 2007 the Company stock fell an additional $0.55 per share, as the Company's failure to clarify the contradictory information in the marketplace created uncertainty and added further credibility to the adverse disclosures issued by *Marketwatch* and other market commentators described above.

<div align="center">

**Applicability of Presumption of Reliance:
Fraud-On-The-Market Doctrine**

</div>

66.     At all relevant times, the market for Medis' common stock was an efficient market for the following reasons, among others.

(a)     Medis' stock met the requirements for listing, and was listed and actively traded on the NASDAQ Global Market, a highly efficient and automated market;

(b)     During the three-day Class Period, 5.0 million shares of Medis stock were traded, representing 14% of Medis' total of 35 million shares outstanding. This demonstrates a very active and broad market for Medis stock during the Class Period and permits a *very strong* presumption of an efficient market;

(c)     As a regulated issuer, Medis filed periodic public reports with the SEC and the NASDAQ;

(d)     Medis during and around the Class Period was eligible and did file Form S-3 registration statements with the SEC;

<div align="center">20</div>

(e)    Medis regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)    Medis was followed by securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms, including Brean Murray Carret & Co.;

(g)    More than 15 NASD member firms were active market-makers in Medis stock at all times during the Class Period; and

(h)    Unexpected material news about Medis was reflected and incorporated into the Company's stock price during the Class Period.

67.    As a result of the foregoing, the market for Medis' common stock promptly digested current information regarding Medis from all publicly available sources and reflected such information in Medis' stock price. Under these circumstances, all purchasers of Medis' common stock during the Class Period suffered similar injury through their purchase of Medis' common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

68.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially

21

from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Medis who knew that those statements were false when made.

### FIRST CLAIM
#### Violation of Section 10(b) of
#### The Exchange Act Against and Rule 10b-5
#### Promulgated Thereunder Against All Defendants

69. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

70. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell Medis' securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

71. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and/or sellers of the Company's securities in an effort to maintain artificially high market prices for Medis' common stock in violation of Section 10(b) of the

Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

72.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Medis as specified herein.

73.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Medis' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Medis and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers and/or seller of Medis' securities during the Class Period.

74.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was

advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of these Defendants was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) each of these Defendants culpably participated in the wrongful conduct alleged herein.

75.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Medis' operating condition and future business prospects from the investing public and supporting the artificially inflated or distorted price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition and business prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Medis' securities was artificially inflated or distorted during the Class Period. In ignorance of the fact that market prices of Medis' publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse

24

information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired and/or sold Medis securities during the Class Period at artificially high and/or distorted prices and were or will be damaged thereby.

77.     At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Medis' financial results, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired or sold their Medis securities, or, if they had acquired or sold such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

78.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

80.     This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.     This second claim is asserted against defendants Lifton and Udis.

83.     The Individual Defendants acted as controlling persons of Medis within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of all aspects of the Company's "commercial sales" to Microsoft and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or tocause the statements to be corrected.

84.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

85.     As set forth above, Medis and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

86.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

87.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)  Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and Plaintiffs' counsel as Class Counsel;

(b)  Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 10, 2007                 Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim, Esq. (PK 9384)
Laurence Rosen, Esq. (LR 5733)
350 Fifth Avenue, Suite 5508
New York, NY  10118
Phone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and Class

28