UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHUN YU WONG, JOHN SELLARS, AND ROYCE OELSCHLAGER, individually and on Behalf of all others similarly situated, | x : : | |
| | : | Case No. 07-CV-3230 (PAC) |
| Plaintiffs, | : | |
| v. | : | Hon. Paul A. Crotty |
| | : | |
| MEDIS TECHNOLOGIES LTD., ROBERT K. LIFTON and ANDREW UDIS, | : : | |
| | : | |
| Defendants. | x | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTS ............................................................................................................................... 4

I.      Background ........................................................................................................... 4

II.     Plaintiffs' Allegations and Documents Contradicting Those Allegations .......... 6

        A.      Defendants' Allegedly Misleading Public Statements ........................... 7

        B.      Plaintiffs' "Historical" Allegations ....................................................... 10

ARGUMENT ................................................................................................................... 11

I.      Standard for Motion to Dismiss ........................................................................ 11

II.     Plaintiffs Fail to Plead Scienter ........................................................................ 12

        A.      Standard for Pleading Scienter .............................................................. 12

        B.      The Amended Complaint Fails to Allege Motive to Commit Fraud ..... 14

        C.      The Amended Complaint Fails to Allege Conscious Misbehavior or
                Recklessness ......................................................................................... 15

        D.      Plaintiffs' "Pattern And Practice" Allegations Do No Support Scienter ............. 23

III.    The Section 20(a) Claim Alleged Against Mr. Lifton and Mr. Udis Fails to
        Adequately Plead an Underlying Securities Violation ...................................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)...................*passim*

*In re Aegon N.V. Sec. Litig.*, No. 03 CIV 0603, 2004 WL 1415973
    (S.D.N.Y. June 23, 2004)...................................................................................12

*In re Bayou Hedge Fund Litig.*, No. 06-CV-2943, 2007 WL 2319127
    (S.D.N.Y. July 31, 2007) .............................................................................*passim*

*Bell Atlantic Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955 (2007) ...............11, 14, 22

*Bragger v. Trinity Capital Enter. Corp.*, No. 92 CIV 2124, 1994 WL 75239
    (S.D.N.Y. March 7, 1994)..............................................................................21

*In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006)...............24

*Chill v. General Elec. Co.*, 101 F.3d 263 (2d Cir. 1996)...................................16

*In re Dynex Capital, Inc. Sec. Litig.*, No. 05 CIV 1897, 2006 WL 314524
    (S.D.N.Y. Feb. 10, 2006) ...............................................................................16

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ................................12

*In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434...........................................*passim*

*Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007) ...........................18

*In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005)................16, 17

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ............................................*passim*

*L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174
    (S.D.N.Y. 1996)......................................................................................19, 21

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*, No. 01 CIV 4388, 2004 WL
    376442 (S.D.N.Y. Feb. 27, 2004)..................................................................18, 24

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429
    (S.D.N.Y. 2003)......................................................................................4, 12

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..............................................17

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ...........................................12

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.,
Inc.*, 75 F.3d 801 (2d Cir. 1996) .............................................................17

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) .......................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. ___, 127 S. Ct. 2499
    (2007) ....................................................................................................................... *passim*

## STATUTES

15 U.S.C. § 78u-4(b)(2) .............................................................................................13

Fed. R. Civ. P. 12(b)(6)...............................................................................................1

Fed. R. Civ. P. 23 ........................................................................................................6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHUN YU WONG, JOHN SELLARS, AND ROYCE OELSCHLAGER, individually and on Behalf of all others similarly situated, | x : : | |
| | : | Case No. 07-CV-3230 (PAC) |
| Plaintiffs, | : | |
| v. | : | Hon. Paul A. Crotty |
| | : | |
| MEDIS TECHNOLOGIES LTD., ROBERT K. LIFTON and ANDREW UDIS, | : : | |
| | : | |
| Defendants. | x | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

Defendants Medis Technologies Ltd. ("Medis" or the "Company"), Robert K. Lifton ("Mr. Lifton") and Andrew Udis ("Mr. Udis") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' First Amended Class Action Complaint (the "Amended Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

**PRELIMINARY STATEMENT**

This case stems from Medis' development of an alternative energy source over the past eight years, embodied in the 24/7 Power Pack (the "Power Pack"), a portable fuel cell recharger for mobile consumer electronic devices. (*See* www.medistechnologies.com/aboutus.shtml.) The Power Pack is designed, among other things, to replace conventional battery chargers for portable devices, and operates using Medis' proprietary technology. *Id.* Since its inception, the viability of Medis' technology has been challenged by other competing companies using

different technologies, and Medis' stock has been plagued with shortsellers wagering that Medis would fail.[1]

In April of this year, for the first time ever, Medis sold Power Packs to a commercial buyer, Microsoft, and in so doing, announced to the world that the Power Pack was a commercially viable product. (*See* Renner Aff., Ex. A, Ex. 1 thereto.)  This was truly an historic moment for the Company.  The sale to Microsoft marked a milestone not only for Medis, but for the entire fuel cell industry, as it was not only the first sale of the Power Pack, but also "the first commercial sales in quantities of *any* consumer fuel cell product." (*Id.*) (emphasis added.)  Medis' April 13, 2007 press release (the "April 13 Press Release") quoted Mr. Lifton as he described this first sale as "an historic moment for [Medis]" and stated that the Company was "pleased to be able to serve Microsoft as our first customer." (*Id.*)  The April 13 Press Release further stated that this historic "first shipment" of Power Packs had been made to Microsoft that day and stated that the Power Packs were Microsoft branded. (*Id.*)

The instant action was filed on the heels of the April 13 Press Release.  Plaintiffs essentially contend that the April 13 Press Release was misleading for what it did not state -- that the shipment to Microsoft was only for a small number of units, and that Microsoft intended to give the units away at upcoming events. (Renner Aff., Ex. A, ¶¶ 42, 45.)  However, it was the *fact* of the sale (and that it carried the Microsoft logo) and not the amount of it or what Microsoft might do with the Power Packs that was significant.  It told those in the industry and potential customers that Medis had succeeded in doing what no company had done since the invention of the fuel cell in 1839,[2] namely, make and deliver a commercial product.  For the Company, as well as the industry, the sale was akin to an announcement such as "Wright Brothers Fly Plane."

---

[1]    *See* Affidavit of Deborah H. Renner, sworn to on November 20, 2007 (the "Renner Aff."), Ex. A (Am. Cmplt, Ex. 7 thereto, at 9).

[2]    *See* http://www.nasa.gov/missions/science/focus_fuel_cell.html.

As one commentator put it: "[I]n the portable fuel cell world, shipping 50 units would be a pretty historic order. So far, most companies have only produced and shown off a few prototypes." (Renner Aff., Ex. L (Apr. 25, 2007 c|net news.com article).)

In order to plead scienter adequately and survive dismissal, Plaintiffs must allege "facts that give rise to the requisite 'strong inference' of scienter [and] a court must consider plausible nonculpable explanations for the defendant's conduct." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. ___, 127 S.Ct. 2499, 2510 (2007). The inference of scienter pled must be "at least as compelling as any opposing inference ...." *Id.* Plaintiffs appear to claim that Defendants issued the April 13 Press Release with the goal of temporarily inflating Medis' stock price -- a nonsensical objective that does not satisfy the *Tellabs* standard. After all, with all the scrutiny given to Medis' statements by shortsellers and the Press, and given that it would only be a matter of time before Microsoft would correct any statements that were incorrect, on Plaintiffs' theory, the purported scheme could *only* have been to temporarily raise the price of the stock. But, for what purpose? Defendants did not sell their own stock as the price of the stock rose, nor do Plaintiffs plead that they did, or ascribe any other motives to Mr. Lifton or Medis. (*See* Renner Aff., Ex. A, *passim*.) With respect to Mr. Udis, Plaintiffs make a conclusory allegation that Mr. Udis would somehow receive a sales commission from an increase in the stock price, which makes no sense whatsoever (and is also untrue). (*See id.*, ¶ 50.) The only reasonable inference that can be drawn from the events of April 13 was that the April 13 Press Release was intended to inform the public and potential customers of an historic milestone for Medis and the fuel cell industry. Nothing else makes sense.

Plaintiffs make additional allegations in an effort to bolster their Amended Complaint, but those allegations cannot support an inference of scienter. They allege, based on internet postings and unnamed sources, that the units were not branded with Microsoft's logo. (*Id.*, ¶¶

42-43.) Those allegations are untrue and belied by public documents, most notably an

Associated Press article, quoting Microsoft and stating that the units did bear a Microsoft logo.

(Renner Aff., Ex. B.) The Amended Complaint is further predicated on an article by a third

party, Dallas Kachan of *Inside Greentech*, that purported to quote Mr. Udis on the sale to

Microsoft. While Plaintiffs make much of this article, they fail to tell the whole story -- that Mr.

Udis and others at the Company attempted to stop the publication of the article when they saw it.

(Renner Aff., Exs. C & D.)[3] Accordingly, the third party statement should not be attributed to

Defendants as a basis for inferring scienter.

At bottom, despite Plaintiffs' contortions and distortions, they have failed to plead even a

marginally plausible scheme, let alone "facts giving rise to . . . [a] 'strong inference' of

scienter." *Tellabs,* 127 S.Ct. at 2510. Accordingly, Defendants respectfully request that the

Amended Complaint be dismissed with prejudice.

## FACTS

### I.    Background

Since it acquired More Energy Ltd. and as a result, nascent fuel technology, Medis has

worked to develop the proprietary fuel cell technology which forms the basis for the Power Pack.

(*See* www.medistechnologies.com/aboutus.shtml; *see also* Renner Aff., Ex. A, ¶¶ 2, 17.) With

the Power Pack, Medis has achieved several landmarks in the fuel cell industry. For example,

when the Power Pack completed the UL certification process and received a UL marking

---

[3]    The Court may consider publicly available documents available to Plaintiffs on this
motion to dismiss. *See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.
2007) (allowing documents filed with SEC and other public documents on motion to dismiss); *In
re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 289 F. Supp.2d 429, 433 n.3
(S.D.N.Y. 2003) (Pollack, J.) (taking judicial notice of newspaper articles for fact of publication,
not for truth asserted).

number, it represented a "remarkable achievement" for the product and the industry as a whole.[4] (Renner Aff., Ex. E (Dec. 26, 2006 Medis 8-K & Exh. 99.1 attached thereto).)  The April 13, 2007 sale to Microsoft represented the latest in this historical series of achievements for the Power Pack.

The April 13 Press Release led to several internet articles and blog postings discussing the sale to Microsoft, the most negative of which have been cherry-picked by Plaintiffs and quoted extensively in the Amended Complaint.  (*See, e.g.*, Renner Aff., Ex. A, ¶¶ 6, 36-39.)  The negative media coverage is unsurprising -- as one Medis shareholder has noted, Medis' Press Releases are often "magnified and scrutinized" in the media "by those that wish our stock to fall," since "70% of the float or more is short our stock."  (Renner Aff., Ex. A, Ex. 7 thereto at 9.)  Despite the media scrutiny, high volumes of Medis stock were traded on April 13th, and share prices rose to an intraday high of $24.10 before closing at $20.32, up $2.03 from the previous day.  (*Id.* at ¶¶ 5, 34-35.)  Microsoft confirmed on April 17, 2007, that it had purchased a "small amount" of Power Packs from Medis for a purchase price of less than $15,000, and indicated that it planned to use the units as giveaways at upcoming events.  (Renner Aff., Ex. A, ¶¶ 9, 42, 45.)  Microsoft confirmed in a statement to the Associated Press that the products bore their logo.  (Renner Aff., Ex. B.)

Since issuing the April 13 Press Release, Medis has achieved several more historic milestones with the Power Pack.  On May 8, 2007, Medis and MyTreo.net ("MyTreo") announced that MyTreo would offer the Power Pack for sale on its website.  (Renner Aff., Ex. F (May 8, 2007 8-K & Ex. 99.1 thereto).)  On June 28, 2007, Medis hosted investors, customers, and vendors in Galway, Ireland, at the launch of the first high-volume assembly line for the Power Pack.  (www.medistechnologies.com/ir_irelandtour.shtml.)

---

[4]      UL is a "not-for-profit safety certification organization that has been testing products and writing Standards for Safety for over a century."  (www.ul.com - "About UL.")

Significantly, in September 2007, Medis demonstrated the Power Pack at the prestigious Intel Developers Forum, and in the Press Release announcing the demonstration, an Intel representative stated that "Medis has reached a major milestone for the fuel cell industry by commercializing their UL Certified Fuel Cell Charger for handheld devices." (Renner Aff., Ex. G (Aug. 20, 2007 8-K & Ex. 99.1 thereto).)

Moreover, on November 13, 2007, Medis announced that the Power Pack was selected by the Consumer Electronics Association ("CEA")[5] as an Innovations 2008 Design and Engineering Award Honoree in the Eco-Design and Sustainable Technology product category. (Renner Aff., Ex. H (Nov. 13, 2007 8-K & Ex. 99.1 thereto).) The award honors products that "exhibit innovative features which are incorporated into consumer electronics that make them safe for the environment and sustainable," and will be presented to Medis in January 2008 at the Consumer Electronics Show in Las Vegas, Nevada. (*Id.*)

## II.    Plaintiffs' Allegations and Documents Contradicting Those Allegations

Plaintiffs bring this lawsuit pursuant to Sections 10(b) and Rule 10b-5 thereunder, and Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of themselves and a purported class who allegedly "purchased the common stock, call options, and/or sold put options of Medis for the time period April 13, 2007 through April 17, 2007, inclusive, and who were damaged thereby."[6] (Renner Aff., Ex. A, ¶¶ 1, 28.)

---

[5]      CEA "represents more than 2,100 corporate members involved in the design, development, manufacturing, distribution and integration of [various electronics, communications, and multimedia products and services] that are sold through consumer channels. Combined, CEA's members account for more than $121 billion in annual sales." (Renner Aff., Ex. H.)

[6]      According to Lead Plaintiffs' certifications, filed previously but not attached to the Amended Complaint, Chun Yu Wong allegedly purchased 20,000 shares of Medis stock on April 13, 2007, sold 10,000 shares on April 18, 2007, and sold 10,000 shares on April 25, 2007. (Declaration of Phillip Kim in Support of Motion to Appoint Lead Plaintiffs, filed June 22, 2007, at Ex. 2.) Royce Oelschlager allegedly purchased 3,000 shares of Medis stock on April 13, 2007, and sold 3,000 shares on April 19, 2007. (*Id.*) John Sellars allegedly purchased 1,000

**A.    Defendants' Allegedly Misleading Public Statements**

Plaintiffs' allegations concern Medis' public statements about the first commercial sale of the Power Packs, and can be broken into two components: (1) the April 13 Press Release and Mr. Lifton's statements therein; and (2) a third party article purportedly quoting Mr. Udis, whose publication the Company tried to stop.

**1.    The April 13 Press Release**

On April 13, 2007, Medis issued a press release announcing its first commercial sale, which stated in relevant part:

> Medis Technologies Ltd. ... announced that it has begun commercial sales of its 24/7 fuel cell Power Packs to Microsoft. The first shipment of Microsoft branded 24/7 Power Packs were made today.
>
> 'This is an historic moment for our company,' said Robert K. Lifton, Chairman and CEO of Medis Technologies. 'It marks the first commercial sales of our 24/7 Power Pack product and indeed, the first commercial sales in quantities of any consumer fuel cell product. We are pleased to be able to serve Microsoft as out first customer.'

(Renner Aff., Ex. A, Ex. 1 thereto.)

Plaintiffs allege that the April 13 Press Release was materially false and misleading. (Renner Aff., Ex. A at ¶¶ 34, 42, 44, 46.) Specifically, Plaintiffs take issue with the statements in the April 13 Press Release that Medis had: (a) "begun commercial sales;" (b) made its "first shipment;" (c) achieved "an historic moment;" and (d) made the "first commercial sales in quantit[y] of any consumer fuel cell product." (*Id.* at ¶¶ 34-35, 42, 44-46.) However, these statements explicitly convey that the sale of Power Packs to Microsoft represented a landmark

---

shares of Medis stock on April 13, 2007; he also allegedly sold 50 put option contracts on April 13, 2007 at a strike price of $20.00 with an expiration date of April 20, 2007, and sold 50 put option contracts on April 17, 2007, at a strike price of $17.50 with an expiration date of April 20, 2007. (*Id.*) At the appropriate juncture, Defendants will challenge the Lead Plaintiffs' ability to represent the putative class under Fed. R. Civ. P. 23, particularly their typicality.

achievement both for Medis and the fuel cell industry, and none of these statements have been contradicted by Microsoft, or anyone else. (*Id.* at ¶ 42.)

Despite the plain meaning of the language in the April 13 Press Release, Plaintiffs allege that Defendants actually intended the Release to convey a "hidden message" to investors: that the commercial sales to Microsoft would be in "significant quantities, would be a source of a significant and continuous revenue stream, and that Microsoft would resell the products to consumers." (*Id.* at ¶ 44.) It is only this hidden message which forms the basis of the present lawsuit. Having set up their strawman position -- based on nothing but lawyer-driven speculation -- it is this hidden message that Plaintiffs contend is contradicted by Microsoft's statements regarding the size of the order, the purchase price, and the plan to use the Power Packs as giveaways. (*Id.* at ¶¶ 42-45, 64-65.)

Plaintiffs also assert that the April 13 Press Release was false and misleading because the Power Packs allegedly were not branded with a Microsoft logo. (*Id.* at ¶¶ 34, 42, 46-48, 63-64, 70.) However, these allegations are based entirely on third party internet articles and statements from unnamed sources. (*Id.* at ¶¶ 42-43.) Plaintiffs have selectively included only the most negative of these articles and statements in the Amended Complaint, and have failed to accurately portray the total mix of information available on the internet regarding Microsoft's statements. (*Id.* & Exs. 5 & 6 thereto.) For example, although Plaintiffs cite unnamed sources who allegedly stated that the Power Packs were not Microsoft branded, an April 23, 2007 Associated Press ("AP") article recounting Microsoft's response to the April 13 Press Release -- an article discussing this very lawsuit and including a statement from Plaintiffs' counsel -- also stated that "*Microsoft has confirmed it purchased a small number of Power Packs with the intention of giving the units away with their logo at events.*" (Renner Aff., Ex. B (emphasis added).)

## 2.    The *Greentech* Article

On April 13, 2007, Dallas Kachan of the online trade publication *Inside Greentech*
published an article on Medis' sale to Microsoft (the "*Greentech* article"). (Renner Aff., Ex. A,
¶¶ 7, 40; Ex. 4 thereto.) The *Greentech* article purported to quote Mr. Udis as saying that
Microsoft "intend[ed] to offer the [Power Pack] to the public," that the "ultimate unit
commitment [from Microsoft] was expected to be 'in the millions,'" and that Microsoft "had
branded the product and plan[ned] to sell [it] around the world." (Renner Aff., Ex. A, ¶ 40.)
However, significantly, in an April 19, 2007 addendum to the *Greentech* article -- which
Plaintiffs conveniently fail to even mention -- Mr. Kachan conceded that "upon seeing [an
advance draft of] the article, a Medis executive . . . called *Inside Greentech* to suggest the
Microsoft order was substantially smaller in size than what the company's spokesperson had told
us." (Renner Aff., Ex. C.)  Mr. Kachan's acknowledgement that the Company tried to correct
the article before it was published was reaffirmed by the Company on April 25, 2007, when the
Company issued a press release reiterating the truth of the April 13 Press Release, and denying
the accuracy of the *Greentech* article:  "a third party article elaborating upon [the April 13 Press
Release] was materially inaccurate and Medis had so informed its author *prior to the article's
publication and told him not to publish the article*." (Renner Aff., Ex. D (emphasis added).)[7]

Plaintiffs, ignoring the effort to stop the publication of the *Greentech* article and
pretending that the article is fodder for this lawsuit, allege that the statements were materially
false and misleading, and further allege that Mr. Udis somehow knew the statements in the
article were false because of his alleged position as Medis' Business Development Manager.
(Renner Aff., Ex. A, ¶¶ 40-42, 49-50.)  Plaintiffs also make the incredulous claim that Mr. Udis

---

[7]      Should this case survive the pleading stage, Defendants will present further evidence
showing the Company's efforts to stop the publication of the incorrect *Greentech* article.

was motivated to issue false statements to increase Medis' stock price because he stood to gain a 1% commission on the sales of the Power Pack product. (*Id.* at ¶¶ 41, 50.)

**B.      Plaintiffs' "Historical" Allegations**

Recognizing the weakness of their allegations that relate to *their case*, Plaintiffs attempt to cast aspersions on Defendants by trying to allege irrelevant "historical pattern and practice" charges. (Renner Aff., Ex. A, ¶¶ 51-62.) These allegations are factually inaccurate and contradicted by the very documents attached to the Amended Complaint.

First, Plaintiffs allege that Mr. Lifton stated during a May 9, 2007 investor call that the Power Pack may be carried onto airplanes, and that he thus encouraged the violation of federal regulations. (*Id.* at ¶¶ 52, 56.) Plaintiffs claim that this is "probative of scienter," and allege the Department of Transportation ("DOT") had not ruled on Medis' petition to amend the Code of Federal Regulations ("CFR") to allow devices such as the Power Pack to be allowed on planes at the time he made the statement. (*Id.* at ¶¶ 55-56.) However, Plaintiffs' claim is contradicted by the very document they attach to the Amended Complaint, which shows that Plaintiffs' allegations are based on selective quotation:

> [O]ur Power Pack is not hazardous. It contains no materials that are damaging in an airplane context, and there is absolutely no legal or moral or any reason that it should not be able to be brought on an airplane. Secondly, we have completed the UL testing, as you know, and that underscores the point that I'm making about the status of the Power Pack and its safety and the like. And so, we are using that material to present to appropriate authorities to be able to explain to them that there is no reason why the Power Pack can be in any way damaging to an airplane. Now, having said all that, I will add this. Our people, and people, and including the persons from -- who did the review on MyTreo.net and elsewhere, have literally carried hundreds and hundreds of Power Packs onto airplanes and have never been stopped.

(Renner Aff., Ex. A, Ex. 7 thereto at 5). Plaintiffs incorrectly assume that carrying Power Packs on airplanes is illegal. More to the point, Mr. Lifton's comments about the Power Pack's safety

are squarely in the context of the UL certification process and the Company's efforts to obtain appropriate DOT clearance for the product. Moreover, the entire text clearly indicates that Mr. Lifton informed investors of Medis' ongoing efforts to seek amendment of the CFR. (*Id.*) Although Plaintiffs also claim that Defendants' attempt to petition for an amendment to the CFR is "further probative of scienter" (Renner Aff., Ex. A, ¶ 56), it is unfathomable how pursuing accepted federal rulemaking procedures could be construed as indicative of scienter.

Second, Plaintiffs make the red herring assertion that Medis' July 28, 2005 announcement of a purchase order from ASE International ("ASE") was misleading because it failed to disclose that Mr. Udis' father-in-law is ASE's Chairman and CEO. (Renner Aff., Ex. A, ¶¶ 57-61, and Ex. 10 thereto.) Of course, this information is obviously public. Plaintiffs further provide an "epilogue" contention that the ASE purchase order has not yet been filled. (Renner Aff., Ex. A, ¶ 62.) However, this allegation conveniently ignores the publicly available information that Medis' high-volume production line has not yet begun to produce Power Packs in large quantities. (www.medistechnologies.com/ ir_irelandtour.shtml.). The ASE purchase order clearly states a firm commitment to purchase the Power Packs in a high volume "for the [first and second] year of availability from Medis production." (*Id.*, Ex. A, Ex. 10 thereto.)

## ARGUMENT

### I.    STANDARD FOR MOTION TO DISMISS

On a motion to dismiss, the Court generally must accept factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). However, a plaintiff cannot survive dismissal with merely conclusory allegations: "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. ___, 127 S.Ct. 1955, 1965

- 11 -

(2007)).  And, "[t]he truth of factual allegations that are contradicted by documents properly

considered on a motion to dismiss need not be accepted."  *In re Aegon N.V. Sec. Litig.*, No. 03

CIV 0603, 2004 WL 1415973, at *5 (S.D.N.Y. June 23, 2004) (Sweet, J.).

In deciding a motion to dismiss, the Court may consider (1) any written instrument

attached to the complaint; (2) statements or documents incorporated into the complaint by

reference; (3) legally required public disclosure documents filed with the SEC; and (4)

documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.

*ATSI Commc'ns, Inc.*, 493 F.3d at 98.[8]  Moreover, the Court may take judicial notice of the

publication of news articles.  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F.

Supp.2d 429, 433 n.3 (S.D.N.Y. 2003) (Pollack, J.).

## II.    PLAINTIFFS FAIL TO PLEAD SCIENTER

### A.    Standard for Pleading Scienter

It is well-settled that to state a *prima facie* case for securities fraud under Section 10(b)

and Rule 10b-5 of the Exchange Act, a plaintiff must allege that "the defendant, in connection

with the purchase or sale of securities, made a materially false statement or omitted a material

fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the

plaintiff."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  The fraud allegations

must be pled with specificity under both Rule 9(b) and the PSLRA, such that there is a strong

inference that defendant acted with the requisite state of mind.  *See, e.g., Rombach v. Chang*, 355

F.3d 164, 171 (2d Cir. 2004) (holding Plaintiffs' fraud allegations must satisfy Rule 9(b)

particularity requirements to, *inter alia*, "safeguard a defendant's reputation from improvident

charges of wrongdoing"); *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.

---

[8]    Accordingly, in addition to relying on the documents attached to the Amended
Complaint, Defendants rely on other public documents attached to the Renner Affidavit and cited
herein.

2007) (holding a securities fraud complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind") (*quoting* 15 U.S.C. § 78u-4(b)(2) (emphasis added)).

Section 10(b) and Rule 10b-5 claims must be dismissed unless the plaintiff properly alleges scienter, *i.e.*, that the defendants had "an *intent* to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (emphasis added) (citation omitted). A plaintiff may establish the requisite intent under two methods: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Showing scienter solely through conscious misbehavior or recklessness, however, requires that "the strength of the circumstantial allegations must be correspondingly greater." *Id.* at 142 (citation omitted).

Pursuant to *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. ___, 127 S.Ct. 2499, 2509-10 (2007), a court adjudicating a Rule 12(b)(6) motion must consider any competing nonculpable explanations for the defendant's conduct:

> [I]n determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. . . . Congress did not merely require plaintiffs . . . to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a *"strong" -i.e., a powerful or cogent-inference.*. . . To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

*Id.* at 2509-10 (emphasis added). Thus, when evaluating competing inferences, a plaintiff's theory of scienter "must be more than merely 'reasonable' or 'permissible'-- it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 2510. Indeed, a "complaint

will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Similarly, in *Bell Atlantic Corp. v. Twombly*, 550 U.S. ___, 127 S.Ct. 1955, 1965, 1974 (2007), the United States Supreme Court held that a plaintiff must "nudge[] their claims across the line from conceivable to plausible" and "raise a right to relief above the speculative level" to survive dismissal. *See, e.g., ATSI Commc'ns, Inc.*, 493 F.3d at 98 & n.2 (securities fraud action applying *Twombly*).

Under Second Circuit law as well, the overall plausibility of the alleged fraudulent scheme is considered when evaluating either method of alleging scienter. *See In re Bayou Hedge Fund Litig.*, No. 06-CV-2943, 2007 WL 2319127, at *8-11 (S.D.N.Y. July 31, 2007) (McMahon, J.) (considering overall plausibility of plaintiff's allegations); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 443-46 & n.83 (S.D.N.Y. 2006) (Scheindlin, J.) (stating that "the Second Circuit authorizes inquiry, even at the motion to dismiss stage, as to whether plaintiffs allege a scheme that has any chance of achieving its putative ends," and further noting that "Courts often refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations") (internal citations omitted). Here, the scheme alleged -- to temporarily increase the price of Medis' stock for no apparent purpose at all -- is nonsensical, and the Amended Complaint should be dismissed.

**B.    The Amended Complaint Fails to Allege Motive to Commit Fraud**

A showing of motive requires plausible allegations of "benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *GeoPharma*, 411 F. Supp. 2d at 441. To successfully plead motive, therefore, Plaintiffs must allege a "concrete and personal benefit" to the Defendants, such as a "desire 'to inflate stock prices while [defendants] sold their own shares.'" *Id.* Moreover, "[w]hen evaluating motive and opportunity allegations,

the Second Circuit authorizes inquiry, even at the motion to dismiss stage, as to whether plaintiffs allege a scheme that has any chance of achieving its putative ends." *Id.* at 443; *see Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (holding motive and opportunity were inadequately pled when the purported concealing of a bank's poor financial condition would be disclosed in the ordinary course of business).

Plaintiffs cannot satisfy the *Tellabs* standard by alleging a scheme with no "putative ends." Indeed, Plaintiffs fail to allege *any* "putative ends" *at all* that motivated Defendants' conduct. For example, Plaintiffs do not -- and cannot -- allege that the Defendants sold their own shares of Medis stock during the Class Period. (*See* Renner Aff., Ex. A, *passim*; Renner Aff., Ex. K ("Medis Insider Transactions Reported - Last Two Years").) Nor do Plaintiffs allege any other concrete and personal benefit to the Defendants from their allegedly misleading conduct. (*See* Renner Aff., Ex. A, *passim*.)

To the extent that Plaintiffs attempt to show a concrete benefit to Mr. Udis through a purported sales commission, such a theory of motive is based on impermissibly conclusory and speculative allegations. (*See* Renner Aff., Ex. A, ¶ 50.); *Cf. ATSI Commc'ns, Inc.*, 493 F.3d at 98 (construing *Twombly* and recognizing that speculative allegations are insufficient to state a claim). Moreover, there is no relationship (alleged, logical, or otherwise) between an increased stock price and any purported commission. Under these circumstances, Plaintiffs have failed to plead motive with respect to Mr. Udis. *See GeoPharma*, 411 F. Supp. 2d at 443 (noting necessity of an inquiry into the plausibility of motive allegations).

**C.    The Amended Complaint Fails to Allege Conscious Misbehavior or Recklessness**

Because the Amended Complaint fails to plead any allegations regarding motive, Plaintiffs must attempt to plead scienter by identifying circumstances indicating conscious misbehavior or recklessness by the Defendants. "To survive dismissal under the 'conscious

misbehavior' theory, the [Plaintiffs] must show that they alleged reckless conduct by the

[Defendants], which is 'at the least, conduct which is highly unreasonable and which represents

an *extreme departure* from the standards of ordinary care to the extent that the danger was either

know to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264

F.3d at 142 (citation omitted) (emphasis added). A showing of recklessness requires that "the

strength of the recklessness allegations must be greater than that of allegations of garden-variety

fraud, *and* the inference of recklessness must be at least as compelling as any opposing

inferences." *See, e.g., In re Bayou Hedge Fund Litig.*, 2007 WL 2319127, at *8 (S.D.N.Y. July

31, 2007) (emphasis original); *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)

(recklessness must "approximate an actual intent to aid in the fraud being perpetrated") (citation

omitted); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (Stein,

J.) ("Recklessness in the scienter context cannot be merely enhanced negligence."). Plaintiffs do

not and cannot plead conscious misbehavior or recklessness.

### 1. Plaintiffs' Scienter Allegations Are Conclusory and Belied by Public Documents

Plaintiffs allege that Mr. Lifton and Mr. Udis are high-level Medis executives who

participated directly in the management of the company, had control over Medis' operations, and

had access to Medis' confidential business information. (Renner Aff., Ex. A, ¶¶ 20-23, 50, 74.)

Because of their alleged positions within Medis, Plaintiffs claim Mr. Lifton and Mr. Udis either

had actual knowledge of the misrepresentations and omissions in their purported public

statements, or recklessly disregarded the truth by failing to obtain information contradicting their

statements. (*Id.* at ¶ 75.) These allegations are clearly insufficient: "[T]he allegations leveled

against a particular individual must demonstrate that his or her culpability is based upon more

than that person's mere position in the corporate hierarchy." *In re Dynex Capital, Inc. Sec.*

*Litig.*, No. 05 CIV 1897, 2006 WL 314524, at *8 (S.D.N.Y. Feb. 10, 2006) (Baer, J.).

Moreover, while Plaintiffs correctly assert that Mr. Lifton has served as Chairman and Chief Executive Officer since Medis' inception, (Renner Aff., Ex. A, ¶ 20.), Mr. Udis is neither an officer nor a director of Medis. (Renner Aff., Ex. I (Medis DEF14A, Apr. 30, 2007, at 3-7); "Management Team," at www.medistechnologies.com/people.shtml.) Instead, his position with the Company has been likened to a sales consultancy, and Plaintiffs provide nothing beyond conclusory allegations of his actual level of involvement in, or knowledge of, Medis' operations. (Renner Aff., Ex. J (May 26, 2006 Form S-3, at 10-12).)[9]

In addition, the Amended Complaint fails to plead scienter adequately because it lacks allegations that Mr. Lifton and Mr. Udis had access to specific facts or information contradicting their public statements. *See, e.g., In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 624 (setting forth pleading standard). Without that basis, Plaintiffs resort to vaguely pleading that Defendants "were reckless in failing to obtain … knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading." (Renner Aff., Ex. A, ¶ 75). As confirmed by Microsoft, the statements made were not false and misleading: Medis indeed made a commercial sale to Microsoft and the units bore Microsoft's logo. (Renner Aff., Ex. B.)

As a matter of pleading, Plaintiffs' conclusory allegation is insufficient as a matter of law. *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss."); *In re Bayou Hedge Fund Litig.*, 2007 WL

---

[9]     Plaintiffs further allege that Mr. Lifton and Mr. Udis are friends, but do not explain how this friendship affects their liability under the Exchange Act. (Renner Aff., Ex. A, ¶ 21.)

2319127, at *8 ("[C]onclusory 'allegations that a defendant "knew or [was] reckless in not

knowing" the true facts will not satisfy a plaintiff's pleading requirements.'"); *In re Loral Space*

*& Commc'ns Ltd. Sec. Litig.*, No. 01 CIV 4388, 2004 WL 376442, at *10-12, 17 (S.D.N.Y. Feb.

27, 2004) (Koeltl, J.) (holding conclusory allegations that defendants were privy to internal Loral

reports and memoranda were insufficient to survive dismissal).

**2.    The April 13 Press Release Does Not Demonstrate Scienter**

**a.    The Alleged Misrepresentation in the April 13 Press
Release Deserves No Credence**

Aside from the purported "hidden message" of the April 13 Press Release, Plaintiffs only

point to one alleged misrepresentation therein -- that the unit was branded with a Microsoft logo.

(*See* Renner Aff., Ex. A, ¶¶ 9, 42-43.)  However, as a matter of pleading, Plaintiffs' allegations

are based on purported statements made by unidentified sources.  Indeed, a commentator on the

very internet blog attached to the Amended Complaint noted the suspicious nature of the

anonymous sources relied upon by Plaintiffs in their allegations:  "Interesting, Herb [Greenberg],

that your Microsoft 'spokesman' and Letzing's [of MarketWatch] 'spokeswoman' are both

unnamed."  (Renner Aff., Ex. A, Ex. 6 thereto.)  The statements of these unnamed Microsoft

sources must be discounted as this Court weighs the strength of the competing inferences

suggested by the Amended Complaint.  *See Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753,

756-57 (7th Cir. 2007) (holding under the *Tellabs* approach the court "must discount allegations

that the complaint attributes to [confidential witnesses because] . . . It is hard to see how

information from anonymous sources could be deemed 'compelling' or how [the court] could

take account of plausible opposing inferences.  Perhaps these confidential sources have axes to

grind.  Perhaps they are lying.  Perhaps they don't even exist.").

Moreover, given Microsoft's obvious desire to fiercely protect the strength of its brand,

would it not be in Microsoft's clear interest to actively and conclusively refute any untrue

- 18 -

statements regarding a purported "Microsoft branded" product?  (*See id.* at ¶ 48.)  Yet here,
Microsoft never refuted Medis' statements that the Power Packs were Microsoft branded.
Instead, it affirmatively stated to the Associated Press that the Power Packs had their logo.
(Renner Aff., Ex. B.)

> **b.    Defendants Had No Clear Duty to Disclose Details of the Microsoft Sale in the April 13 Press Release**

To the extent that Plaintiffs' scienter allegations vis-à-vis the April 13 Press Release
focus on the Defendants' nondisclosure of details regarding the Microsoft sale, "a failure to
disclose particular information, by itself, can only constitute recklessness if there was an *obvious*
duty to disclose that information."  *GeoPharma*, 411 F. Supp. 2d at 446 (emphasis added);
*Kalnit*, 264 F.3d at 143 (holding where the duty to disclose "was not so clear," the "defendants'
recklessness cannot be inferred from the failure to disclose"); *L.L. Capital Partners, L.P. v.
Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174, 1183 (S.D.N.Y. 1996) (holding when duty to
disclose is "debatable," bare allegations that defendants were reckless in failing to disclose are
insufficient).  There was no "obvious" duty to disclose here.  Indeed, it was the Company's
business practice *not* to disclose the number of units or the price per unit when it came to the
Company's customers (as opposed to its practices vis-à-vis distribution agreements).  (*See*
Renner Aff., Ex. A, Ex. 7 thereto at 4.)

*GeoPharma* is instructive.  In the Summer of 2004, GeoPharma issued press releases
stating it was developing a *drug* to fight mucositis.  *GeoPharma*, 411 F. Supp. 2d at 438.
However, GeoPharma only sought and received FDA approval for a *medical device* to treat
mucositis.  *Id.*  On December 1, 2004, GeoPharma issued a press release announcing the FDA's
approval of Mucotrol as a "prescription product."  *Id.* at 439.  Investors allegedly thought that the
company had received approval for a new drug and the stock soared 153% higher to reach an all-
time high.  *Id.*  However, when the market learned that Mucotrol had received marketing

approval only as a medical device, the shares tumbled. *Id.* at 439-40. Plaintiffs alleged that

GeoPharma issued the misleading December 1 press release to inflate the stock price for five

days to take advantage of provisions in their financing agreements which allowed GeoPharma to

pay note holders and preferred shareholders with stock in lieu of cash payments if a certain

average closing price could be maintained for at least five days. *Id.* at 440.

Judge Schiendlin dismissed the complaint in *Geopharma* for failure to adequately allege

scienter. *Id.* at 453. Analyzing the complaint as a whole, Judge Schiendlin first determined that

the fraudulent scheme was nearly destined for failure because GeoPharma knew that the media

would contact the FDA promptly for the details of Mucotrol approval. *Id.* at 442. Thus, there

was very little chance that the stock price could have remained artificially inflated for the

requisite five day period. *Id.* With respect to recklessness, Judge Schiendlin stated that while

"GeoPharma disclosed its FDA approval for Mucotrol, it omitted the more detailed and specific

information regarding Mucotrol's approval as a *medical device*," but "a failure to disclose

particular information, by itself, can only constitute recklessness if there was an *obvious* duty to

disclose that information." *Id.* at 446 (citing *Kalnit*, 264 F.3d at 143-44) (emphasis added).

Despite the materiality of the information, the *GeoPharma* court held that there was no obvious

duty to disclose the information regarding Mucotrol's approval as a medical device and therefore

scienter could not be inferred because "plaintiffs must allege something more to suggest that

defendants *intended* to confuse the market by omitting material information." *Id.* (emphasis

original).

The *GeoPharma* court explained that it "is entirely possible for a defendant to make an

honest but negligent mistake in judging how much detail needs to be included in public

statements in order to avoid misleading the public, [but] [t]he purpose of section 10(b) and Rule

10b-5 is to punish *knowing* fraud or reckless behavior, *not* mistakes that arise from negligent or

even grossly negligent behavior." *GeoPharma*, 411 F. Supp. 2d at 436-7  (emphasis added).

Thus, scienter will not be found when the duty to disclose is "debatable." *L.L. Capital*

*Partners, L.P.*, 921 F. Supp. at 1183; *Kalnit*, 264 F.3d at 143-44.  The rationale for this standard

is aptly stated in *Bragger v. Trinity Capital Enter. Corp.*, No. 92 CIV 2124, 1994 WL 75239, at

*4 (S.D.N.Y. March 7, 1994):

> Plaintiff, in effect, contends that anytime an entity proffers any
> information about itself to the public, the proffer, in order to be
> 'complete,' must include any and all material information about
> the entity.  Were it to accept Plaintiff's argument, this Court would
> make extinct the typical one-page corporate press release and, in
> its place, require, for even the most mundane of announcements, a
> binder-full of financial and regulatory data commensurate with a
> mandatory SEC Filing.  Even the broadest reading of 'complete' in
> this context cannot rationally stretch to compel disclosure on such
> a grand scale in order to avoid the conclusion that anything less is
> misleading for purposes of Rule 10b-5.

Here, as in *GeoPharma*, there was no duty to disclose the details of the Microsoft sale,

because what was "historic" was the *fact* of the first shipment and sale in the industry, and not

the quantities involved.  *See* 411 F. Supp. 2d at 446.  Indeed, as a matter of business practices,

the Company's policy was not to disclose the quantity or dollar amount of its sales, as shown in

one of the very documents Plaintiffs attach to the Amended Complaint, which states that the

Company's customers "instructed [Medis] ... not to present the number of units that they buy

and not to present the amounts of dollars they pay per unit." (*See* Renner Aff., Ex. A, Ex. 7

thereto at 4.)[10]  Under the circumstances in this case, one cannot infer that Defendants intended

to defraud or confuse the market with the April 13 Press Release -- especially in light of the

overall implausibility of Plaintiffs' purported scheme.  *GeoPharma*, 411 F. Supp. 2d at 443.

---

[10]     Although Medis does not disclose the quantity or dollar amounts of its sales to customers,
it does provide this information in announcing distribution agreements and other arrangements
with distributors.  *See, e.g.*, Renner Aff. Ex. A, Ex. 10 thereto.

### 3.    The Statements in the *Greentech* Article Cannot Be Attributed to Mr. Udis

Plaintiffs allege that Defendants are liable for statements about the Power Pack published by *Inside Greentech*.  However, Plaintiffs did not provide the Court with the corrected, published version of the *Greentech* Article, which unequivocally demonstrates that a "Medis executive, upon seeing [an advance draft of] our article, called *Inside Greentech* to suggest the Microsoft order was substantially smaller in size. . ." (Renner Aff., Ex. C.)  The author's public acknowledgement that Medis attempted to stop the publication of the *Greentech* article was corroborated by the April 25, 2007 Medis press release, which states that "a third party article elaborating upon [the April 13 Press Release] and cited in the plaintiff's complaint was materially inaccurate and that Medis had so informed its author *prior to the article's publication and told him not to publish the article*."[11]  (Renner Aff., Ex. D (emphasis added).)  Under these circumstances, the statements in the *Greentech* article cannot be attributed to Defendants as the basis for inferring scienter.  *Cf. In re Bayou Hedge Fund*, 2007 WL 2319127, at *11 (examining competing inferences to determine strength of plaintiff's scienter allegations).

Under *Tellabs,* the Court must consider the inference that the *Greentech* article stemmed from nonculpable conduct -- namely that Mr. Udis was misquoted and that the Defendants tried to stop its publication.  *Id.*; *Tellabs*, 127 S. Ct. at 2509-10.  Plaintiffs' competing inference -- that Mr. Udis purportedly lied intentionally to Mr. Kachan so his statements would inflate Medis' stock price for an unspecified personal gain -- defies logic, especially when viewed against the fact that Defendants promptly contacted *Inside Greentech* upon seeing a draft of the *Greentech* article and requested that the article not be published.  Plaintiffs' claims are neither conceivable nor plausible, and must be dismissed.  *See Twombly*, 127 S.Ct. at 1965.

---

[11]     Neither Dallas Kachan, nor *Inside Greentech*, has contradicted Medis' April 25, 2007 statement that Mr. Kachan was: 1) advised that the *Greentech* article was inaccurate; and 2) asked by Medis not to publish the inaccurate *Greentech* article.

4.    **The Purported Scheme Makes No Sense**

*Tellabs* and Second Circuit precedent require that Plaintiffs plead a "strong inference" of

scienter in order to survive a motion to dismiss.  Laying competing inferences side-by-side, that

means that the inference of scienter Plaintiffs ask the Court to draw must be "at least as

compelling" as Defendants' "plausible opposing inference."  *Tellabs,* 127 S. Ct. at 2509-10.

Here, as in *Geopharma,* Plaintiffs' allegations of a purported scheme to defraud the public

cannot withstand scrutiny.  *See* 411 F. Supp. 2d at 443, 446.  Not only is there no motive alleged

and no conscious misbehavior or recklessness, but the alleged scheme concocted by Plaintiffs

makes no sense.  In essence, Plaintiffs ask the Court to find that scienter has been adequately

pled based on allegations -- allegations belied by documents Plaintiffs attach to the Amended

Complaint or which are based on anonymous sources -- that Medis sought to temporarily

increase the price of its stock -- "temporarily" because with shortsellers, the Press and Microsoft

watching, the purported scheme could not have gone on for very long.  While there might be

some circumstances, such as in *Geopharma,* where a temporary rise in the price of stock may

allegedly matter, here, there is no such reason, and none has been pled.  *Id.* at 442-43.  Indeed,

the only inference to be drawn regarding scienter is that the Company announced what had been

historic -- the commercial sale and delivery of a product for the first time for the Company and

for the fuel cell industry, using a new technology.  There was nothing diabolic about the April 13

Press Release, and Plaintiffs' efforts to recast the events as conduct giving rise to the requisite

scienter cannot pass muster under *Tellabs* and Second Circuit case law.

D.    **Plaintiffs' "Pattern And Practice" Allegations Do No Support Scienter**

Although Plaintiffs also claim scienter is shown through an "historical pattern and

practice of failing to be forthright in [Medis'] disclosures to investors" (Renner Aff., Ex. A, ¶

51), this is little more than an attempt to distract the Court from the plain inadequacy of their

scienter allegations. Plaintiffs' improper attempt to impugn Defendants' reputation with these allegations should not be countenanced by the Court. *See In re Bayou Hedge Fund*, 2007 WL 2319127, at *9 (refusing to consider misrepresentations relating to transactions on which the plaintiffs did not seek relief); *GeoPharma*, 411 F. Supp. 2d at 450-51 (considering and rejecting plaintiffs' "prior history" allegations, in part because of the "overall weakness of the scienter inference created by the Amended Complaint"); *In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 778-79 (S.D. Ohio 2006) (finding pattern of bad behavior does not create an inference of scienter).[12]

III.    **The Section 20(a) Claim Alleged Against Mr. Lifton and Mr. Udis Fails to Adequately Plead an Underlying Securities Violation**

Since a primary violation is a necessary element of a Section 20(a) claim, it is well-established that failure to prove primary securities liability precludes Section 20(a) control person liability. *See, e.g., In re Bayou Hedge Fund*, 2007 WL 2319127, at * 12 (failure to plead a primary 10(b) violation requires dismissal of related 20(a) claims); *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *19 (same). For the reasons discussed above, there is no primary liability, and therefore the Section 20(a) claims against Mr. Lifton and Mr. Udis should be dismissed.

---

[12]    Even if these allegations could be considered as evidence of scienter -- which they cannot be -- as described above, many of these purported pattern and practice allegations are taken out of context and belied by the very documents attached to the Amended Complaint.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court  dismiss the

Amended Complaint in its entirety.

SONNENSCHEIN NATH & ROSENTHAL LLP


By:   /s/ Deborah H. Renner
Reid L. Ashinoff (RA 0281)
Deborah H. Renner (DR 4225)
Benito Delfin, Jr. (BD 1216)
Abigail Lauer (*admission pending*)
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

*Attorneys for Defendants*
*Medis Technologies Ltd., Robert K. Lifton,*
*and Andrew Udis*

17579127

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CHUN YU WONG, JOHN SELLARS, AND      :
ROYCE OELSCHLAGER INDIVIDUALLY    :
AND ON BEHALF OF ALL OTHERS        :
SIMILARLY SITUATED,                  :

                                 :   Case No.: 07-CV-3230 (PAC)
           Plaintiffs,          :
   v.                         :   **CERTIFICATE OF SERVICE**
                                 :
MEDIS TECHNOLOGIES LTD., ROBERT K.  :
LIFTON, and ANDREW UDIS,         :
                                 :
          Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2007, a copy of the foregoing Defendants' Motion

to Dismiss First Amended Class Action Complaint ("Motion to Dismiss") was caused to be

served upon the Court and the following by ECF, and that an additional copy of the Motion to

Dismiss was served upon Mr. Kim by e-mail:

          Phillip Kim, Esq.
          Laurence Rosen, Esq.
          THE ROSEN LAW FIRM, P.A.
          350 Fifth Avenue, Suite 5508
          New York, NY 10118
          pkim@rosenlegal.com

Dated: November 20, 2007

                       Respectfully submitted,

                       _____/s/ Deborah H. Renner_____
                       Deborah H. Renner (DR 4225)
                       SONNENSCHEIN NATH & ROSENTHAL LLP
                       1221 Avenue of the Americas
                       New York, NY  10020
                       Phone:  (212) 768-6700
                       Fax:  (212) 768-6800

            *Attorneys for Medis Technologies Ltd., Robert K. Lifton, and Andrew Udis*