UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
CHUN YU WONG, JOHN SELLARS, AND                    Case no.: 07-CV-3230 (PAC)
ROYCE OELSCHLAGER INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS                        CLASS ACTION
SIMILARLY SITUATED,

      Plaintiffs,

      vs.

MEDIS TECHNOLOGIES LTD.,
ROBERT K. LIFTON and ANDREW UDIS,

      Defendants.
--------------------------------------------------------X


**LEAD PLANTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**


THE ROSEN LAW FIRM, P.A.
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

Lead Counsel for Lead Plaintiffs and Class

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS……………………….. .............................................................3

    A.    The Materially False and Misleading Statements to Investors ...............................5

    B.    Defendants' Motion to Dismiss ..............................................................................6

POINT I
THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS ....................................................................7

    A.    Applicable Pleading Standards ...............................................................................7

    B.    The April 13, 2007 Press Release Was Materially False and Misleading ..............8

        1.    The "Commercial Sales" to Microsoft Were Not "Microsoft
            Branded" ..........................................................................................8

        2.    Defendants' Omissions of Material Fact Also Rendered the April
            13, 2007 Press Release Materially False and Misleading .........................10

        3.    Defendants Had a Duty to Disclose the Details of the "Commercial
            Sales to Microsoft" of "Microsoft Branded" PowerPacks Reported
            in the April 13, 2007 Press Release .........................................................11

        4.    Defendants Do Not Dispute that the April 13, 2007 *Greentech*
            Article Is Materially False and Misleading................................................11

        5.    The Truth of the Alleged Misstatements Can Be Learned from
            Unnamed Sources .....................................................................................12

POINT II
THE COMPLAINT ADEQUATELY ALLEGES SCIENTER .....................................................13

    A.    Applicable Legal Standard for Pleading Scienter...................................................13

    B.    The Complaint Sufficiently Alleges Facts, Circumstantial and Otherwise,
        Demonstrating Conscious Misbehavior or Recklessness ......................................15

          1.    Knowledge of the Falsity of Defendants' Statements Is Imputed to
            the Defendants.........................................................................................16

2.      Scienter as to the April 13, 2007 Press Release ........................................17

3.      Scienter as to the April 13, 2007 *Greentech* Article .................................19

4.      Defendants' Recycled Motive and Opportunity Argument Should
        Be Rejected ...............................................................................................21

5.      Defendants' Prior Misbehavior Supports an Inference of Scienter............22

POINT III
THE CONTROL PERSON CLAIMS ARE ADEQUATELY ALLEGED IN THE
COMPLAINT…. .....................................................................................................................23

CONCLUSION.........................................................................................................................24

TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*ACA Financial Guranty Corp. v. Advest, Inc.*,
   --F.3d---, 2008 WL 104099  (1st Cir. Jan. 10, 2008)....................................................15, 18

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ........................................................................................16

*In re AOL Time Warner, Inc. Secs. Litig.*,
   503 F. Supp.2d 666 (S.D.N.Y. 2007)................................................................................7, 19

*In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*,
   381 F. Supp.2d 192 (S.D.N.Y. 2004) ...............................................................................18

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ..............................................................................8, 13, 15, 17

*Bell Atlantic v. Twombly*,
   127 S.Ct. 1955 (2007)..........................................................................................................7

*In re BP Prudhoe Bay Royalty Trust Secs. Litig.*,
   2007 WL 317435  (W.D. Wash. Oct. 26, 2007) ...............................................................22

*Caiola v. Citibank N.A.*,
   295 F.3d 312 (2d Cir. 2002)................................................................................................9

*Commodity Futures Trading Com'n v. Rosenberg*,
   85 F. Supp.2d 424 (D.N.J. 2000) .....................................................................................22

*Cosmas v. Hasset*,
   886 F.2d 8 (2d Cir. 1989) ............................................................................................16, 17

*In re Enron Corp. Secs. & Derivative & "ERISA" Litig.*,
   2005 WL 3504860 (S.D. Tex. Dec. 22, 2005)..................................................................12

*Epstein v. Itron, Inc.*,
   993 F. Supp. 1314 (E.D. Wash. 1998)...............................................................................16

*In re eSpeed, Inc. Secs. Litig.*,
   457 F. Supp.2d 266 (S.D.N.Y. 2006)................................................................................16

*Fograzzo v. Lehman Bros., Inc.*,
   431 F. Supp.2d 274 (S.D.N.Y. 2004)..................................................................................8

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)..........................................................................................13

*In re GeoPharma, Inc. Secs. Litig.*,
    411 F. Supp.2d 434 (S.D.N.Y. 2006).....................................................................18, 19

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985).......................................................................................10

*Helwig v. Vencor, Inc.*,
    251 F.2d 540 (6th Cir. 2001) ....................................................................................11

*Higginbotham v. Baxter International, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ...............................................................................12, 13

*In re International Business Machines Corporate Secs. Ltiig.*,
    163 F.3d 102 (2d Cir. 1998) .......................................................................................21

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007)..........................................................................................7

*In re JP Morgan Chase Secs. Litig.*,
    363 F. Supp.2d 595 (S.D.N.Y. 2005)..........................................................................16

*Kassner v. 2nd Avenue Deli, Inc.*,
    496 F.3d 229 (2d Cir. 2007)...........................................................................................7

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)........................................................................................14

*Makor Issues & Rights, Ltd. v. Tellabs*,
    -- F.3d ---, 2008 WL 151180  (7th Cir. Jan. 17, 2008) ......................................12

*McCarty v. Dun&Bradsteet Corp.*,
    482 F.3d 184 (2d Cir. 2007).........................................................................................9

*McMahan v. Wherehouse Enterntainment, Inc.*,
    900 F.2d 576 (2d Cir. 1990).........................................................................................9

*New Jersey v. Sprint Corp.*,
    -- F. Supp. 2d--, 2008 WL 191780 (D. Kan. Jan. 23, 2008) .............................15

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)..........................................................................15

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..................................................................................8, 15

*Nursing Home Pension Fund 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ........................................................................22

*Overton v. Todman & Co., CPAs, P.C.*,
    478 F.3d 479 (2d Cir. 2007)............................................................................21

*Podany v. Robertson Stephens, Inc.*,
    318 F. Supp.2d 146 (S.D.N.Y. 2004)..............................................................8

*In re Refco Secs. Litig.*,
    503 F. Supp.2d 611 (S.D.N.Y. 2007)..............................................................9

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002)............................................................................11

*Roeder v. Alpha Induc., Inc.*,
    914 F.2d 22 (1st Cir. 1987).............................................................................11

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974).........................................................................................10

*In re Scottish Re Group Secs. Litig.*,
    -- F. Supp. 2d --, 2007 WL 3256660  (S.D.N.Y. Nov. 1, 2007) ......................14

*S.E.C. v. Collins & Aikman Corp.*,
    --F. Supp.2d--, 2007 WL 4480025 (S.D.N.Y. Dec. 21, 2007) ........................14

*In re Silicon Graphics, Inc. Secs. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ..........................................................................16

*Sloman v. Pressteck, Inc.*,
    2007 WL 2740047  (D.N.H. Sept. 18, 2007)..................................................15

*In re StockerYale*,
    453 F. Supp.2d 345 (D.N.H. 2006)..................................................................9

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)..........................................................................14, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)............................................................7, 9, 12, 14, 22

*In re Time Warner, Inc. Secs. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ........................................................................................11, 18

*In re Top Tankers, Inc. Secs. Litig.*,
    -- F. Supp.2d --, 2007 WL 4563930  (S.D.N.Y. Dec. 18, 2007) ..........................14, 15, 21

*United States v. Benton,*
    852 F.2d 1456 (6th Cir. 1988) ...........................................................................................22

*United States v. Bice-Bey*,
    701 F.2d 1086 (4th Cir.1983) ............................................................................................22

*United States v. Weisman,*
    736 F.2d 421 (7th Cir. 1984) .............................................................................................22

*In re Winstar Communications*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).....................................................................12

## FEDERAL STATUTES

Fed. R. Evid. 404(b)............................................................................................................. 22

15 U.S.C. § 78u-4(b)(2) ...................................................................................................15

Lead Plaintiffs Chun Yu Wong, John Sellars, and Royce Oelschlager ("Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss filed by defendants Medis Technologies Ltd. ("Medis" or the "Company"), Robert K. Lifton ("Lifton"), and Andrew Udis ("Udis").  Medis, Lifton and Udis are collectively referred to herein as the "Defendants."

## PRELIMINARY STATEMENT

In this securities class action, Plaintiffs seek damages under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of all persons or entities that purchased the common stock, call options and/or sold put options for Medis Technologies, Ltd. ("Medis" or the "Company") during the time period from April 13, 2007 through April 17, 2007, inclusive (the "Class Period") and a were damaged thereby.

The First Amended Complaint (the "FAC" or "Complaint") presents a compelling case of securities fraud—precisely the type of fraud against which the Exchange Act and the Private Securities Litigation Reform Act of 1995 ("PSLRA") were intended to protect investors.

Throughout the Class Period, Defendants materially misrepresented certain "commercial sales" of the Company's sole product, the 24/7 Power Pack, a fuel cell battery recharger used to charge cell phones, mp3 players and other portable devices (the "PowerPack"). On April 13, 2007, through a press release and news article, the Company informed investors that the PowerPacks were to be "Microsoft branded" and were to be sold by Microsoft under its own name to consumers throughout the world.  FAC ¶¶ 34, 40.  Indeed, defendant Udis in a statement told investors that the unit commitment from Microsoft would be in the "millions" and he reiterated that Microsoft had "branded" the PowerPack and was going to sell it "around the world."  FAC ¶ 40.

This was big news for the Company, as the PowerPack had yet to be proven a viable product for consumers.  Defs. Br. pp. 4-5. [1]  Microsoft's "branding" of the product and apparent commitment to sell it around the world provided credibility and validation of Medis' efforts in developing the PowerPack, which the Defendants admit was subject to wide-spread doubts. FAC ¶ 47; Defs. Br. pp. 4-5.

---

[1] All references herein to "Defs. Br. p(p) __" refer to Defendants' Memorandum of Law In Support of Motion to Dismiss First Amended Class Action Complaint filed with the Court on November 20, 2007.  Docket no. 14.

Medis' CEO and Chairman Lifton described this "first" sale as "historic".   Defendants have likened the occasion to the Wright brothers' first flight.  Indeed, the market took notice, and the value of Medis' shares rose dramatically. FAC ¶ 34; Defs. Br. p. 2.  Defendants' statements in the April 13th press release were gross exaggerations.  The reality was that the PowerPacks were not "branded" by Microsoft and were not going to be resold by Microsoft under its own name. Rather, the PowerPacks were to be given away at events—essentially as party favors or trade show freebies.  FAC ¶¶ 42-3.  When market commentators began to cast doubt on this historic sale (FAC ¶¶ 37, 39), Defendant Udis made additional, even more serious misrepresentations to *Inside Greentech*, an industry publication ("*Greentech*"), adding more fuel to the fire.  Udis misrepresented to *Greentech* that Microsoft had committed to purchasing millions of PowerPacks from Medis and that "They've branded the product and plan to sell these around the world."  FAC ¶ 40.

The truth is, there were no agreements between Microsoft and Medis to sell or develop the PowerPack, and the unit commitment from Microsoft was not in the millions, but instead for less than $15,000 worth of PowerPacks.  FAC ¶¶ 42-3.

As the market learned of these adverse disclosures, the price of Medis securities fell dramatically and Plaintiffs and the Class were damaged. FAC ¶¶ 63-5.

Defendants do not move to dismiss the Complaint on the basis that it fails to demonstrate a materially false statement. Rather, Defendants move on the narrow issue of scienter, asserting they did not act recklessly or knowingly in issuing the materially misleading statements. Defendants also assert that there was no duty to disclose the details of the sale to Microsoft – but this argument ignores the allegations of affirmative misrepresentations by Defendants. Once Defendants choose to speak on a subject, their statements must be true, and must not omit any pertinent details that render the statements misleading.

The totality of the facts alleged in the Complaint, however, clearly demonstrates a cogent and compelling strong inference of scienter because the statements pertaining to the "commercial sales" of "Microsoft Branded" PowerPacks were materially false and misleading, as the PowerPacks were not "branded" by Microsoft, and the Company, while duty-bound to do so, failed to disclose that the "commercial sales" of PowerPacks were not for resale by Microsoft to consumers, but rather to be given away free at trade shows.  There is a material difference between a "Microsoft branded" product being resold to consumers under the Microsoft brand

name and a Medis branded product that has a Microsoft logo on it being given away free as a gimmick at trade shows. Medis affirmatively misled investors to believe that Medis was acting as an original equipment manufacturer and that Microsoft was reselling the PowerPack to consumers under its well-recognized brand name. Defendant Udis gave further support to this lie when he told *Greentech* that Microsoft had committed to purchasing millions of units for sale around the world under the Microsoft brand name.

This case is not grounded upon a failure to disclose. It rests on affirmative misrepresentations. Thus, Defendants assertions that no duty to disclose existed is irrelevant, as Medis choose to speak, and the statements it issued were required to be true. Since Lifton and Udis cannot credibly claim that they mistakenly believed Microsoft was selling the PowerPacks under the Microsoft brand name or that it had committed to purchasing millions and planned to sell them to consumers around the world, those statements are clearly false. Defendants do not offer any reasonable basis for those statements. Therefore, their scienter is evident beyond any doubt.

## STATEMENT OF FACTS

Defendant Medis is a development stage company that is primarily in the business of developing the PowerPack. *See* FAC ¶ 2. Medis has never earned any material revenues from the sales of PowerPacks and the viability of the PowerPack as a mass produced commercial product is still in question. FAC ¶¶ 4, 47; Defs. Br. pp. 4-5.

On the early morning of Friday, April 13, 2007, Medis announced that it had "begun commercial sales" of its PowerPacks to Microsoft and that the "first shipment of *Microsoft branded*" PowerPacks had been made. FAC ¶ 34, Ex. 1. The market reaction to this announcement was extremely positive, as Medis' stock price reached an intraday high of $24.16 per share and closed the day up 11% at $20.32 per share, on volume that was 20 times that of the previous trading day. FAC ¶ 35. Indeed, defendant CEO Lifton called the moment "historic." FAC ¶ 34, Ex. 1. The April 13, 2007 morning announcement states in relevant part:

MEDIS TECHNOLOGIES BEGINS COMMERCIAL SALES OF ITS FUEL CELL 24/7 POWER PACK

NEW YORK, NY - APRIL 13, 2007 - MEDIS TECHNOLOGIES LTD. (NASDAQ:MDTL) announced that it has **begun commercial sales** of its 24/7 fuel

cell Power Packs to Microsoft. The **first shipment of Microsoft branded** 24/7 Power Packs were made today.

"This is an **historic moment** for our company," said Robert K. Lifton, Chairman and CEO of Medis Technologies. "It marks the first commercial sales of our 24/7 Power Pack product and indeed, the first commercial sales in quantities of any consumer fuel cell product. We are pleased to be able to serve Microsoft as our first customer."

FAC Ex. 1. (*emphasis added*).

Later in the day on April 13, 2007, in response to numerous media inquiries about the nature of the PowerPack sales to Microsoft and questioning the significance of the announcement to Medis' business (FAC ¶¶ 37, 39), defendant Udis, the Company's agent[2] and Business Development Manager (FAC ¶ 21), conducted an exclusive interview with Dallas Kachan, Acting Editor of the California-based trade publication *Greentech*. FAC ¶ 40. This interview culminated in the publication of an article by *Greentech* on the afternoon of April 13, 2007. FAC ¶ 40, Ex. 4. Defendants do not dispute that at the time Udis gave the interview with Dallas Kachan for the *Greentech* article, Udis' statements would be disseminated to the investing public and acted upon in determining whether or not to purchase and sell Medis securities. FAC ¶ 41. Nor do Defendants suggest that Mr. Kachan or *Greentech* had any motive to misstate or misreport the statements of Udis, Microsoft spokespersons and other persons quoted.

The *Greentech* article, entitled "Microsoft to Sell Fuel Cells," quoting Mr. Udis, states that Microsoft "branded" the PowerPack and "plan[s] to sell these around the world." Also quoting Udis, the *Greentech* article states that the ultimate unit commitment of PowerPacks from Microsoft was expected to be "in the millions". FAC ¶ 41, Ex. 4. The *Greentech* article also describes Medis as Microsoft "OEM partner" and reiterates the Company's earlier statement that the announcement was "historic". *Id.* The *Greentech* article states in relevant part:

Microsoft to Sell Fuel Cells
By Dallas Kachan
Published April 13, 2007 - 12:00pm

---

[2] Defendant Udis was at all times an authorized agent of the Company. He was responsible for obtaining sales for the Company and his role was even reported as such in a June 1, 2006 Form 8-K the Company filed with the SEC. FAC ¶ 21. To suggest that Udis would not have knowledge of the Microsoft sales is incredible, especially since he is responsible for creating sales for the Company. Indeed, the ASE $50 million purchase order was from Udis' father-in-law. Thus, Udis was an integral part of the Company. FAC ¶¶ 58, 61.

Microsoft is to soon start offering a fuel cell-based power pack product for powering personal electronics, its **OEM partner revealed today**.

Medis Technologies of New York (NASDAQ: MDTL) said it has delivered its first shipment of special **Microsoft-branded versions** of its Direct Liquid Fuel Cell (DLFC)-based "24/7 Power Pack" product.

While the company wouldn't specify the quantity of the initial shipment, or of the contract's total volume, business development manager **Andrew Udis told Inside Greentech the ultimate unit commitment was expected to be "in the millions."** A Microsoft spokesperson would only acknowledge that the company made "a small purchase" from Medis, but **Udis confirmed Microsoft intends to offer the devices to the public.**

"They've branded the product and plan to sell these around the world."

Shares of Medis were up $2.60 today, almost 15%, trading at $20.99.

"This is an historic moment for our company," said Robert K. Lifton, Chairman and CEO of Medis, in a statement.

"It marks the first commercial sales of our 24/7 Power Pack product and indeed, the first commercial sales in quantities of any consumer fuel cell product. We are pleased to be able to serve Microsoft as our first customer."

FAC Ex. 4. (*emphasis added*).

## A.    The Materially False and Misleading Statements to Investors

The April 13, 2007 statements made by Defendants pertaining to the "commercial sales" of "Microsoft Branded" PowerPacks were materially false and misleading because (a) Microsoft never agreed to "brand" the PowerPack under the Microsoft brand name; (b) Microsoft had no plans to sell the fictitious "Microsoft branded" PowerPacks "around the world"—let alone sell to any consumer—but rather intended to give the units away at an "*upcoming event*"— i.e. as trade show freebies; (c) there were no "Microsoft branded" PowerPack sold to consumers; (d) there were no agreements between Medis and Microsoft of any nature; (e) there were no partnerships between Medis and Microsoft around accessories or anything else; and (f) the unit commitment from Microsoft was not expected to be in the "millions" and the sales mentioned in the announcements were for a relatively small total purchase price of less than $15,000.  FAC ¶¶ 9, 42-50.

The market began learning the truth about these "commercial sales" to Microsoft after market-close on April 17, 2007, when it was reported by noted Journalist John Letzing of *Marketwatch* that a Microsoft spokeswoman had told him that "Microsoft Corp. has no plans to sell fuel cell products capable of re-charging portable electronic devices." Mr. Letzing, further quoting the Microsoft spokeswoman, reported that Microsoft "is not planning to sell [PowerPacks] to consumers" and that only a "small amount" was purchased to be **distributed for free at an upcoming event.** FAC ¶ 42, Ex. 5 (*emphasis added*).

Later on April 17, 2007, Journalist Herb Greenberg of *Marketwatch* reported additional details. Mr. Greenberg, quoted a Microsoft spokesman as saying that Microsoft has "**no plans to resell these products around the world**" and Microsoft has no plans "for development of the product." FAC ¶ 43, Ex. 6. Mr. Greenberg also stated that proxy research firm Glass Lewis reported that the PowerPack is "**not a Microsoft branded product**", there are no agreements between Microsoft and Medis, no partnerships between them, and described the "**commercial sales" touted by Medis "as akin to Microsoft buying a pen or a Frisbee."** FAC ¶ 43, Ex.7.

The April 17, 2007 corrective disclosures shocked the market on the first day of trading following the disclosures. On April 18, 2007, the Company's stock fell $1.54 per share on heavy trading volume and continued to fall an additional $.55 per share the following two days. FAC ¶ 65.

### B.    Defendants' Motion to Dismiss

On November 20, 2007, Defendants moved to dismiss claims for primary liability on the basis that the Complaint does not sufficiently allege the requisite state of mind—scienter—to assert a primary violation under Section 10(b) and Rule 10b-5.[3]

Defendants assert that the complaint does not present a cogent and compelling strong inference of scienter because: (1) certain statements alleged in the complaint are not false or materially misleading (Defs. Br. pp. 18-19); (2) Defendants had no duty to disclose details of the PowerPack sales in the April 13, 2007 press release (Defs. Br. pp. 19-21); (3) the scienter allegations are conclusory as to each of the defendants; (Defs. Br. pp. 16-17); (4) there is no

---

[3] Defendants move to dismiss the Control Person liability claims under Section 20(a) based solely on their contention that a primary violation under Section 10(b) and Rule 10b-5 is not sufficiently alleged. They do not challenge, and thus admit, that "control" and culpable participation is sufficiently alleged as to Lifton and Udis.

scienter as to Udis' statements in the April 13, 2007 *Greentech* article because he was misquoted and Defendants *tried* to correct them (Defs. Br. pp. 22); (5) lack of any motive weighs against scienter (Defs. Br. p. 23); and (6) Defendants' prior misbehavior does not support the allegations of scienter (Defs. Br. 23-24).

**ARGUMENT**

Preliminarily, it appears that Defendants have conflated the requirements of pleading falsity and those of pleading scienter.  Defendants do not dispute that the challenged statements are material and Defendants *do not* move to dismiss on the basis that the statements are not false.  Rather, Defendants assert that the statements they issued on April 13, 2007, were not materially false and misleading only as a basis to support their assertion that scienter cannot be established for those statements.  For a more cogent presentation of the issues, Plaintiffs will address falsity allegations first and then proceed to the scienter allegations.

**POINT I**

**THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY FALSE AND
MISLEADING STATEMENTS AND OMISSIONS**

**A.    Applicable Pleading Standards**

The Supreme Court recently clarified the pleading standards under Rule 8(a) in *Bell Atlantic v. Twombly*, 127 S.Ct. 1955 (2007); *see also In re AOL Time Warner, Inc. Secs. Litig.*, 503 F. Supp.2d 666, 670 (S.D.N.Y. 2007).  As construed by the Second Circuit, *Bell Atlantic* imposes: a flexible "plausibility standard," which obliges a pleader to amplify claims with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cri. 2007) (*emphasis in original*).  The Second Circuit has reaffirmed, following *Bell Atlantic*, that on a Rule 12(b)(6) motion, "[t]he court is to draw all reasonable inferences in favor of the plaintiff."  *Kassner v. 2nd Avenue Deli, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

In addition, "faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).

Of course, the heightened pleading standards contemplated by Rule 9(b) and the PSLRA also continue to apply to actions under the Exchange Act. The PSLRA has established a

heightened pleading requirement for securities class actions such as this one.  In order to sufficiently plead a securities fraud claim, a complaint must set forth with sufficient particularity the circumstances constituting the fraud, as required by Fed. R. Civ. P. 9(b).  This requirement serves to provide a defendant with fair notice of a plaintiff's claims and to protect a defendant from a strike suit.  *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (*citing references omitted*).

Where, as here, a securities fraud action is predicated on misstatements, the complaint "must (1) specify the statements that plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI*, 493 F.3d at 99 (*citing Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

**B.     The April 13, 2007 Press Release Was Materially False and Misleading**

**1.     The "Commercial Sales" to Microsoft Were Not "Microsoft Branded"**

The April 13, 2007 Press Release issued by Medis is materially false and misleading because it falsely and affirmatively states that the PowerPacks sold to Microsoft were "Microsoft branded."  FAC ¶¶ 34, 42.  This was simply not the case, as reported by a journalist with *Marketwatch*, quoting a Microsoft official stating the PowerPacks are "not a Microsoft branded product."  FAC ¶ 43. This is sufficient to plead that Defendants made a material misstatement in the April 13th press release.  *See Podany v. Robertson Stephens, Inc.*, 318 F. Supp.2d 146, 154 (S.D.N.Y. 2004) ("a material misstatement of *fact* is alleged by pointing to the true fact about the world that contradicts the misstatements.") (*emphasis in original*); *Fograzzo v. Lehman Bros., Inc.*, 431 F. Supp.2d 274, 294 (S.D.N.Y. 2004) (*same*).

Defendants, however, contend that the PowerPacks were in fact "Branded" by Microsoft because a subsequent news article published by a third-party after the end of the Class Period suggests that the PowerPacks were shipped with the Microsoft logo.  Defs. Br. pp. 18-9.  There is a material difference between Microsoft branding and reselling the PowerPacks under Microsoft's brand name and Microsoft giving away the PowerPacks for free at trade shows with Microsoft's logo on them.  Defendants intentionally misled investors to believe that Microsoft was placing its imprimatur on the PowerPack, throwing its unparalleled marketing weight behind it and reselling it as a Microsoft product.  Defendants' intention to mislead investors on this point is evident in Udis' subsequent misrepresentation that Microsoft was an "OEM Partner" and would resell the PowerPacks around the world.  FAC ¶¶ 40, 46-8.

Even assuming *arguendo* the PowerPacks bore Microsoft's logo (which the Court cannot find at this stage), as demonstrated more fully below, Defendants' statements that the Company made "commercial sales" of "Microsoft branded" PowerPacks were rendered materially false and misleading because the Company failed to disclose that Microsoft had no intention to sell the PowerPacks to consumers, but rather planned to give them away at an upcoming event as trade show freebies.  FAC ¶¶ 45-6.  "Brand" or "Branding" is a term of art used by companies and is understood as such by the investing community.  "Marketers see a brand as an implicit promise that the level of quality people have come to expect from a brand will continue with future purchases of the same product."[4]  FAC ¶¶ 47-8.  *See Fogarazzo*, 341 F.Supp.2d at 294 ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact."); *McMahan v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors ….  The disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead."); *In re StockerYale*, 453 F. Supp.2d 345, 350 (D.N.H. 2006); *Caiola v. Citibank N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("upon choosing to speak, [Defendants] must speak truthfully about material issues.").

Moreover, the Court should not consider this document or contention, as it is not within the four corners of the Complaint, is not referenced therein, and was published outside the relevant Class Period – after the initial complaint in this action was filed.  *See McCarty v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (when assessing complaint on motion to dismiss, limited to four corners of complaint, materials attached thereto, and referenced); *Tellabs, Inc.*, 127 S.Ct. at 2502 (court must accept allegations in complaint as true).  At most, Defendants' contention creates a question of fact not subject to adjudication at the pleading stages because there are two independent sources quoting Microsoft officials: one claiming the PowerPack is not Microsoft branded, and another claiming the PowerPack had Microsoft's logo on it.  *In re Refco Secs. Litig.*, 503 F.Supp.2d 611, 623 (S.D.N.Y. 2007) ("The Court is 'not to

---

[4] *See* http://www.wikipedia.org "Brand Management" ("Powerful brands can drive success in competitive and financial markets, and indeed become the organisation's most valuable assets.")

weigh the evidence that might be presented at trial but merely to determine whether the complaint is sufficient.'")[5]

### 2. Defendants' Omissions of Material Fact Also Rendered the April 13, 2007 Press Release Materially False and Misleading

Defendants narrowly focus the Court's attention to selected words in the April 13, 2007 press release in isolation and wholly outside the context of the entire April 13th press release. However, when read together in context, it is more than clear that the April 13th press release was materially false and misleading.

> Medis Technologies Ltd. (Nasdaq:MDTL) announced that it has **begun commercial sales** of its 24/7 fuel cell Power Packs to Microsoft. **The first shipment of Microsoft branded** 24/7 Power Packs were made today.

FAC, ¶ 34, Ex. 1 (*emphasis added*).

Even if the PowerPacks bore Microsoft's logo, the April 13, 2007 press release would have been misleading because Defendants failed to disclose that the PowerPacks were not branded as a Microsoft product, and were not to be resold by Microsoft, but rather were to be given away free as trade show freebies.  FAC ¶ 46. These statements were also made in the context of Defendants' failure to disclose that there were no agreements between Medis or Microsoft, no joint development, or any endorsement of the PowerPack and its technology.  FAC ¶ 42.  By affirmatively informing investors that the PowerPack was branded, without disclosing these other material facts, Defendants misled the investing public to believe that Microsoft stood behind the quality and reliability of the PowerPacks, and that Microsoft validated this technology.  FAC ¶ 47.

In light of the entire context of the April 13th press release, Medis was informing investors that Microsoft was branding its PowerPack.   This misstatement misleadingly communicated Microsoft's validation of the PowerPack's technology and viability.  Indeed, this is precisely what the market believed.  FAC ¶¶ 47, 48, 42-3.

Of course, none of this was true, because Microsoft had no plans to sell the PowerPacks "around the world"—let alone sell to any consumer, but rather intended to give the units away at

---

[5] *Quoting Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

an "*upcoming event*"—as trade show freebies; there was no "Microsoft branded" PowerPack sold to consumers; there were no agreements between Medis and Microsoft; and there were no partnerships between Medis and Microsoft around accessories or anything else.  FAC ¶¶ 9, 42-50.

> ### 3.    Defendants Had a Duty to Disclose the Details of the "Commercial Sales to Microsoft" of "Microsoft Branded" PowerPacks reported in the April 13, 2007 Press Release

It is black letter law that an omission is actionable "only when the [defendant] is subject to a duty to disclose omitted facts." *In re Time Warner, Inc. Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  A duty "arises whenever secret information renders prior public statements materially misleading" and not merely when the information negates the public statements.  *Time Warner*, 9 F.3d at 268.  Thus, "when a corporation makes a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *Roeder v. Alpha Indus., Inc.*, 914 F.2d 22, 27 (1st Cir. 1987); *Helwig v. Vencor, Inc.*, 251 F.2d 540, 561 (6th Cir. 2001) ("even absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects.'") (*quoting reference omitted*).

As demonstrated above in Points IB1 and IIB2, the failure to disclose that the "commercial sales" to Microsoft were not for "branded" for resale but rather the to be given away at events as trade show freebies, rendered the Company's April 13, 2007 statements materially false and misleading. Thus, Defendants had a clear duty to disclose the omitted information.

> ### 4.    Defendants Do Not Dispute that the April 13, 2007 *Greentech* Article Is Materially False and Misleading

Defendants do not dispute that the following statements issued by defendant Udis in the April 13, 2007 *Greentech* article are materially false and misleading:

- Microsoft would soon be offering the PowerPack to consumers – acting as Medis' OEM Partner.
- Ultimate unit commitment for the commercial sales to Microsoft would be "in the millions"; and
- "[Microsoft] branded the product and plans to sell these around the world."

FAC ¶¶ 40, 42 & Defs. Br. p. 9, no. 7, and p. 22.

Each of these statements are demonstrably false as shown by the corrective news articles published in *Marketwatch* in which Microsoft spokespersons were quoted as saying no agreements existed with Medis. Microsoft was not an OEM partner. Microsoft was not planning to resell the PowerPack and it would not bear the Microsoft brand name. The "commercial sale" consisted of a one-time purchase of no more than $15,000 worth or PowerPacks to be distributed free to attendees at an upcoming tradeshow event – similar to a pen or a Frisbee. FAC ¶¶ 42-43. Moreover, Defendants do not dispute that when Udis made these statements to *Greentech*, the Defendants knew that Udis' statements would be publicly disseminated to the investing public and acted upon in determining whether to purchase and sell Medis securities. FAC ¶ 41.

5.    **The Truth of the Alleged Misstatements Can Be Learned from Unnamed Sources**

Defendants assert that statements from unnamed spokespersons at Microsoft reported by journalists should somehow be discounted in determining the falsity of the statements alleged in the April 13th announcements and scienter. Defs. Br. pp. 16-20. This assertion is a red herring because Defendants do not dispute the allegations in the Complaint that (a) Microsoft has never agreed to "brand" and resell the PowerPack around the world, (b) Microsoft is not an OEM (original equipment manufacturer) partner of Medis, and (c) the total purchase commitment is an insignificant amount - less than $15,000 – not a unit commitment in the millions. Since all parties agree that these statements are false, whether or not the sources for the information are named or unnamed is irrelevant.

Secondly, the fact that the corrective information concerning the fraud comes from journalists quoting unnamed sources at Microsoft does not negate that the statements made by the Defendants are false. It is well settled that the market can learn of the truth of an alleged misstatement in many ways, including reports published by journalists. *In re Winstar Communications*, 2006 WL 473885 * 14 (S.D.N.Y. Feb. 27, 2006) ("the market may learn of possible fraud [from] a number of sources: e.g. whistleblowers, analysts' questioning financial results, resignation of CFOs or auditors, announcement by the company of changes in accounting treatment going forward, newspapers and journals, etc.") (*quoting In re Enron Corp. Secs. & Derivative & "ERISA" Litig.*, 2005 WL 3504860 * 16 (S.D. Tex. Dec. 22, 2005)).

Defendants cite to *Higginbotham v. Baxter International, Inc.*, 495 F.3d 753-57 (7th Cir. 2007) to suggest that the April 17th *Marketwatch* articles should be heavily discounted in

determining falsity and scienter.  Defs. Br. P. 18.  *Higginbotham* is not binding on this Court and Defendants misread it.  In *Higginbotham,* confidential sources were former employees of the defendant corporation's Brazilian subsidiary, and were proffered to show that the parent was aware of the fraud at that subsidiary, even though there were allegations the fraud was concealed by the Brazilian operations from the parent defendant corporation.  In that case, the plaintiffs refused ever to disclose the identities of those persons. Because the *Higginbotham* court was concerned that those purported confidential witnesses might not even exist, it discounted the facts from those confidential witnesses in determining whether the defendant corporation knew of the fraud at its Brazilian subsidiary. *See Makor Issues & Rights, Ltd. V.* Tellabs, -- F.3d ---, 2008 WL 151180 * 8 (7th Cir. Jan. 17, 2008) (explaining holding in *Higginbotham*).

This is not the situation here, where the unnamed Microsoft spokespersons are being cited by independent third party journalists, rather than a self-interested party to the litigation.  Additionally, the testimony of these Microsoft officials will not be withheld from any party in the litigation, as such persons would be available during discovery via a deposition and there are no facts to suggest that any of the journalists had any incentive to lie.  Lastly, and perhaps most importantly, there is no dispute that the PowerPacks were not to be resold to the public by Microsoft but rather were to be provided as trade-show freebies, that there were no agreements between Medis and Microsoft in this regard, and the like, that are contained in the same April 17 *Marketwatch* articles.  FAC ¶¶ 42-3; Defs. Br. p. 22.  Defendants have in essence confirmed the truth of the statements from the Microsoft sources.

Thus, *Higginbotham* is not applicable in this case in determining falsity or scienter, and the Court must consider at face value what was reported by the journalists in the April 17th *Marketwatch* articles.

## POINT II

### THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER

Having demonstrated in Point I, *supra.* That the April 13th Press Release and *Greentech* articles are materially false and misleading, Defendants' scienter argument is distilled down to the following components.  Defendants assert: (1) that the allegations attributing knowledge of the true nature of the commercial sales to each of the Defendants are conclusory (Defs. Br. pp. 18-19); (2) the fraud does not make sense because there is no motive alleged (Defs. Br. p. 23); (3) Defendants believed that the April 13th Press Release was not materially false and misleading

because the PowerPacks bore Microsoft's logo and they had no duty to disclose the number of PowerPacks sold (Defs. Br. pp. 18-21); (4) Defendants attempted to stop publication of the *Greentech* article, so no scienter can be demonstrated from that article (Defs. Br. pp. 22); and (5) the prior misbehavior of the Defendants does not support a finding of scienter (Defs. Br. pp. 23-24).

### A.    Applicable Legal Standard for Pleading Scienter

Under the PLSRA pleading standard, "the complaint shall, with respect to each act or omission alleged to violate this chapter state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—scienter. *ATSI*, 493 F.3d at 99 (*citing* 15 U.S.C. § 78u-4(b)(2)). Scienter can be pled two ways, "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud; or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.2d at 99 (*citing Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000).

Where, as here, scienter is alleged under the latter standard, a plaintiff must show that the conduct is "at least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendants must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Therefore, an express allegation of deliberate misconduct is sufficient to plead scienter. *See S.E.C. v. Collins & Aikman Corp.*, --F. Supp.2d--, 2007 WL 4480025 * 5 (S.D.N.Y. Dec. 21, 2007) (*citing Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001))

The United States Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007) provided further guidance to Courts in assessing whether scienter is sufficiently alleged.[6] The Supreme Court had "granted certiorari to resolve the disagreement among the Circuits on whether, and to what extent, a court must consider competing inferences in determining whether a securities fraud complaint gives rise to a "strong inference" of

---

[6] The *Tellabs* decision did not address whether the recklessness satisfies the scienter requirement. "Thus, Second Circuit law, which permits scienter to be shown by recklessness, continues to bind this Court." *Collins & Aikman Corp.*, 2007 WL 4480025 at * 5, no. 83 (*citing references omitted*).

scienter." *Id.* at 2502.  The Supreme Court answered this question by "establishing the following prescriptions":

"First, faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Id.* at 2502 (*citations omitted*).[7]

"Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs,* 127 S.Ct. at 2502 (*citations omitted*);

"Third, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences." *Tellabs,* 127 S.Ct. at 2502.

Lastly, the Supreme Court resolved the issue by defining a "strong" inference of scienter as an inference that is "cogent and at least as compelling: as any opposing inference of nonfraudulent intent." *Id.* at 2502.  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.

Thus, if the inferences urged by Plaintiffs are equally plausible as those urged by Defendants, a tie is decided in favor of Plaintiffs and the Court must find the Complaint meets the standards for a strong inference of scienter under the PSLRA.  *See Top Tankers*, 2007 WL 4563930 * 5 ("courts since *Tellabs* have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for defendant's conduct, the 'tie goes to the plaintiff.") *(quoting Sloman v. Presstek, Inc.*, 2007 2740047 * 7 (D.N.H. Sept. 18, 2007)); *see also ACA Financial Guranty Corp. v. Advest, Inc.*, -- F.3d---, 2008 WL 104099 *8 (1ˢᵗ Cir. Jan. 10, 2008) ("where there are equally strong inferences

---

[7] *See also In re Scottish Re Group Secs. Litig.*, -- F. Supp. 2d --, 2007 WL 3256660 * 7 (S.D.N.Y. Nov. 1, 2007) (court must accept the "allegations as accepted as true")*; See In re Top Tankers, Inc. Secs. Litig.*, -- F. Supp.2d --, 2007 WL 4563930 * 5 (S.D.N.Y. Dec. 18, 2007) ("The Tellabs decision also emphasizes that the inquiry is to be made in the context of a traditional motion to dismiss—assuming well-pleaded facts of the complaint to be true…")

for and against scienter, *Tellabs* now awards the draw to the plaintiff."); *New Jersey v. Sprint Corp.*, -- F. Supp. 2d--, 2008 WL 191780 * 7 (D. Kan. Jan. 23, 2008) (*same*).

> B.    **The Complaint Sufficiently Alleges Facts, Circumstantial and Otherwise, Demonstrating Conscious Misbehavior and Recklessness[8]**

There is no dispute that scienter can be properly alleged with allegations "constituting strong circumstantial evidence of conscious misbehavior or recklessness" in the absence of motive and opportunity. *ATSI,* 493 F.3d at 99 (*citations omitted*). Conscious misbehavior generally constitutes conduct "which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 631 (S.D.N.Y. 2003). Pleading recklessness is satisfied when a plaintiff "specifically allege[s] defendants' knowledge of facts or access to information contradicting their public statements." *Novak,* 216 F.3d at 308 (holding that a complaint pleads recklessness where it alleges that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation").

> 1.    **Knowledge of the Falsity of Defendants' Statements Is Imputed to the Defendants**

Under Second Circuit caselaw, knowledge of contradictory information (i.e. scienter) is imputed to a corporation's executive officers and key employees when the information would involve a significant part of the corporation business. *See Cosmas v. Hasset*, 886 F.2d 8, 10 (2d Cir. 1989); *see also In re eSpeed, Inc. Secs. Litig.*, 457 F. Supp.2d 266, 293 (S.D.N.Y. 2006) (same) (*citing cases*); *In re JP Morgan Chase Secs. Litig.*, 595, 628 (S.D.N.Y. 2005 ("When information is at the core of a company's business, it may be properly ascribable to senior officers."); (*citing cases*); *see also Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1226 (E.D. Wash. 1998) ("[F]acts critical to a business' core operations or an important transaction are generally so apparent that their knowledge may be attributed to the company and its key officers.")

---

[8] Defendants make much ado about the lack of allegations of motive and opportunity. Defs. Br. pp. 14-15. Plaintiffs are not pursuing their theory of scienter on motive and opportunity. In any event, scienter can be sufficiently alleged through facts demonstrating conscious misbehavior or recklessness. *ATSI*, 493 F.2d at 99.

(*abrogated on other grounds by In re Silicon Graphics, Inc. Secs. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)).

Likewise, the scienter of a corporation's officers and agents can be imputed to a corporation. *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001) (holding that the scienter of agent of corporate defendant is attributable to corporation); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003) (explaining that "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as primary violator under §10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority [,]" and collecting cases to support that proposition).

Here, it is beyond dispute that the PowerPack was Medis' sole and lead product. FAC ¶ 2, Defs. Br. pp. 1-2. Moreover, one cannot dispute that Medis' future success depended on Medis' ability to commercialize the PowePack into a viable mass produced consumer product. *Id.* Defendant Lifton is Medis' founder, CEO and Chairman. FAC ¶ 20. Likewise, defendant Udis is a longtime friend of Lifton and the Company's business development manager. FAC ¶ 21. Udis has the responsibility to acquires sales for the Company, and receives a commission for each sale he books, as reported in the Company filings. FAC ¶¶ 21, 50.[9] It would be unbelievable to suggest that Udis was not acting as an agent of the Company when he made his statements to *Greentech* or that he would not have knowledge of the "historic" sales to Microsoft. Indeed, his compensation was tied to obtaining commercial sales, and in fact the ASE $50 million purchase order was made to his father-in-law. FAC ¶¶ 21, 50, 60-1. Any other inference would be incredible.

Under these facts, it is inconceivable that the any of the Defendants did not know that the "commercial sales" to Microsoft were not for resale as Microsoft branded products but to be distributed for free as trade show giveaways, that there were no agreements between Microsoft and Medis of any kind, and the like. Indeed, Lifton even called the "commercial sales" historic and Defendants have likened it to the Wright Brothers first flight. FAC ¶ 34; Defs. Br. p. 2. If Lifton and Udis were unaware of, and had no access to, the truth concerning the sale to

---

[9] Defendants wrongly assert that the Complaint alleges that Udis was motivated to make the false statements he did to *Greentech* because he would receive a 1% commission (Defs. Br. p. 15), there is no such allegation in the Complaint.

Microsoft, why then did they issue any public statements at all on the subject?  Defendants had no business issuing a press release and making public statements for which they had no reasonable basis.  Such misconduct – issuing statements without regard to their truth - is highly reckless. *See ATSI,* 493 F.3d at 99

Defendants Lifton and Udis made affirmative misstatements.  They claimed Microsoft was branding the product as its own.  Udis stated that the purchase commitment was in the millions and that Microsoft was planning to sell the PowerPacks around the world.  Even Defendants admit these statements were false.  Defs. Br. p. 9.  Defendants offer no reasonable basis for making these false statements.  Plaintiffs need not evaluate what Lifton and Udis actually knew; it is enough to allege they made affirmative false statements with no reasonable basis.  *See Cosmas*, 886 F.2d at 10, *supra.* (imputing knowledge); *Novak,* 216 F.3d at 308 (holding that a complaint pleads recklessness where it alleges that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation").

### 2.    Scienter as to the April 13, 2007 Press Release

As demonstrated above, the April 13, 2007 press release is materially false and misleading because it contains affirmative statements that are not true, i.e. the product was Microsoft branded.  Thus, on this statement alone, scienter is demonstrated because it strains all credibility to believe that the Defendants did not know Microsoft had not "branded" the PowerPacks.  *See* Point IIB1, *supra.*

Moreover, as demonstrated above, in Points IA1 and IA2, even assuming, *arguendo*, that the PowerPacks bore Microsoft's logos (which the court should not, as allegations in the complaint must be deemed true), the statements would be independently materially false and misleading on account of the alleged material omissions.  There is a material difference between a market leader 'branding" a product as its own and merely placing its logo on an incidental tradeshow freebie, akin to a company placing its logo on a pen or coffee mug.  Thus, there was a clear and obvious duty to disclose the omitted information. *See Time Warner*, 9 F.3d at 268, *supra.*

Defendants, however, cite *In re GeoPharma, Inc. Secs. Litig.*, 411 F. Supp.2d 434, 446 (S.D.N.Y. 2006), a pre-*Tellabs* decision to suggest, that there was no "obvious" duty to disclose details of the *quantity* of the of PowerPacks in the April 13, 2007 press release.  Defs. Br. pp. 19-

21.   In any event, *GeoPharma* does not apply to the facts of this case.  *See In re AOL Time Warner, Inc. Secs. and "ERISA" Litig.*, 381 F. Supp.2d 192 (S.D.N.Y. 2004) (scienter inquiry is assessed on a case-by-case basis); *ACA Financial Guaranty Corp. v. Advest, Inc.*, --F.3d--, 2008 WL 104099 * 15 (1ˢᵗ Cir. Jan. 10, 2008) ("There is no set pattern of facts that will establish scienter; it is a case-by-case inquiry.")

    *Geopharma* involved no affirmative misstatements, but rather involved a failure to disclose material information.   Here, there is a clear affirmative misstatement, that the PowerPacks were "Microsoft branded."    FAC ¶ 42.   In addition, Udis later made affirmative misstatements that Microsoft was expected to commit to purchase millions of PowerPacks for sale around the world.   FAC ¶ 40.

    Moreover, in *Geopharma* the plaintiffs complained that the corporation should have disclosed that the "prescription product" approval it received from the FDA mentioned in a press release, was a medical device, because the market believed the "prescription product" was a drug, which the company was also developing at that time.   411 F. Supp. 2d. at 446.   Judge Scheindlin held that no scienter could be inferred from this omission because there was no obvious duty to disclose it because the plain reading of the press release was not misleading.   That press release stated that the "prescription product" "manages" the medical condition—which by definition could not have referred to a drug, as drugs do not manage conditions.  *Id.* at 447.   Here the facts are much different.   No reasonable person could read the April 13ᵗʰ press release and determine the PowerPacks were not intended for resale by Microsoft to the public, but rather as trade show freebies.

    Additionally, in *Geopharma* Judge Scheindlin found that that the true details of the FDA approval were readily available to the investing public and that Defendants were not hiding anything, because the information was readily available and verifiable through public sources. *Id.* at 448.   Judge Scheindlin also cited to the fact that "once confusion caused by the December 1 Release became apparent", the next day defendants held a conference call to clarify the press release issued.  *Id.* at 448.   This is not the case here, where after the materially false April 13, 2007 press release was issued, which caused the Company's stock to dramatically rise, Medis added gasoline to the fire when it caused the *Greentech* article to be published that same day. FAC ¶ 40.   Moreover, the investing public did not have the same access to the truth from Microsoft, as it would have if it were a public oversight agency such as the FDA.

### 3.   Scienter as to the April 13, 2007 *Greentech* Article

There is no dispute that the *Greentech* article is materially false and misleading.  Rather, Defendants contend they "attempted to stop the publication of the *Greentech* article" (Def. Br. p. 22) and claim that an April 19, 2007 posting by Mr. Kachan of *Greentech* supports this contention.  While the argument may be appealing, it is not supported by the record; the record actually supports the Court finding scienter.

The posting, which is dated April 19, 2007, states in relevant part:

Microsoft's "trade show giveaway" claim.
Submitted by Dallas Kachan on Thu, 2007-04-19 07:13.

This week Microsoft started asserting in the media that is has only ordered a small quantity of Medis' fuel cells as trade show giveaways.

This flies in the face of what we were told by Medis itself, as quoted above, which, when specifically asked, emphatically maintained that Microsoft was ordering these in large quantities ('millions," he said) for resale.

As the one who performed the interview with Medis, let me confirm that is indeed what we were told by the company.

As for the record, a Medis executive, upon seeing our article, called Inside Greentech to suggest the Microsoft order was substantially smaller in size than what the company's spokesperson had told us.  No contrary numbers were given. Nor was there any suggestion made that that these products weren't intended for resale.

Renner Decl., Ex. C.[10]

Clearly, all that this web posting shows is that a Medis executive at some point in time (the date is not clear) contacted Mr. Kachan to suggest only that the size of the order was substantially smaller in size.  Based on the context, it is more likely to infer that the Defendants only attempted to correct the misstatement concerning the quantity of PowerPacks sold to Microsoft..

Likewise, the April 23, 2007 AP article also does not support the contention that Medis attempted to correct the *Greentech* article.  That article merely states:

---

[10] All references to the "Renner Decl. __" Refer to the Affidavit of Deborah Renner, dated November 20, 2007, submitted in support of Defendants' Motion to Dismiss on file with the Court.  Docket No. 13.

Lifton said that Udis—a consultant with the company—was misquoted, and that Medis tried to correct the mistake with Greentech.  Greentech said it stands by the piece, but confirmed that a Medis spokesmen had said Udis misspoke.

Renner Decl. Ex.  B.

All defendants have created is yet another question of fact that cannot be resolved at this stage. [11]

In any event, Mr. Kachan's April 19, 2007 posting actually supports a finding of scienter in either circumstance.  If Defendants attempted to correct the *Greentech* article prior to publication or to stop it, the posting clearly indicates the Company selectively requested correction of certain false information (i.e. that the unit commitment was "in the millions" (FAC Ex. 4)) but then chose not to correct the other false information (i.e. that the product was Microsoft branded and would be resold to consumers around the world (FAC Ex. 4)).  Likewise, if Defendants asked Mr. Kachan to correct the misquotes after the publication of the article on the likely date of April 19, 2007, the same selective correction would be present and would be further bolstered because as of April 19, 2007, the *Marketwatch* articles of April 17, 2007 had already been released, indicating that the products were not to be sold around the world to consumers, not branded by Microsoft, and the like.

Lastly, even if one were to assume the incredulous proposition that Defendants did not know the full details of the commercial sales to Microsoft when they made the statements they did on April 13, 2007, Defendants had a duty to correct their statements when they learned of the truth.  If they attempted to stop the publication of the *Greentech* article, then they knew the truth on April 13, 2007, were aware that inaccurate information was in the marketplace and were duty-bound to correct both the *Greentech* article and the press release issued that day. Medis could

---

[11]   Defendants essentially admit that this is a question of fact for discovery in their chest-pounding statement in their brief that "should this case survive the pleading stage, Defendants will present further evidence showing the Company's efforts to stop the publication of the incorrect *Greentech* article."  Defs. Br. p. 9, no. 7.  Moreover, the Court should reject the April 25 Press Release (Renner Decl., Ex. D) issued by the Defendants that suggests that they attempted to stop publication of the *Greentech* article.  It is a self-serving article issued in response to the filing of this lawsuit and is being offered for the truth of the matter asserted.

have easily issued its own corrective press release – *it never did*.[12]  Failure to abide by such a duty is probative of scienter—especially here—where Defendants, themselves, have never corrected the misstatements in the April 13, 2007 press release.  *See In re International Business Machines Corporate Secs. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) (The duty to correct applies when 'a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not. Thus, if and when a speaker learns that a prior statement was misleading when made, a duty to correct arises.'); *see also Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 487 (2d Cir. 2007) (an accountant's duty to correct).

### 4.    Defendants' Recycled Motive and Opportunity Argument Should Be Rejected

Defendants assert that there is no inference of scienter because the "alleged scheme" does not make sense, because the end result here is only "temporarily inflation" of the Company's stock for no apparent ends, and that there is nothing "diabolical" about the facts in this case. Defs. Br. p. 23.  This is merely a lack of motive and opportunity argument in disguise.  Plaintiffs are not obliged to allege a scheme with a defined ends, nor do they have to allege a "diabolical" one. Allegations of motive are simply not required in order to properly plead a §10b action. *Tellabs,* 127 S.Ct. at 2511.

Plaintiffs merely have to allege facts that demonstrate that Defendants made material misstatements or omissions of fact, that Defendants knew to be false or did so in reckless disregard to the truth at the time the statements were made.  Plaintiffs have done that, and courts have routinely found scienter under the same circumstances.  *See e.g. Top Tankers,* 2007 WL 456390 * 6 (finding scienter adequately alleged even though there was no motive alleged); *In re BP Prudhoe Bay Royalty Trust Secs. Litig.,* 2007 WL 317435 * 3 (W.D. Wash. Oct. 26, 2007) (finding scienter adequately alleged even in absence of motive where "through contemporaneous information or data available to defendants that contradicts their public statements.") (*citing*

---

[12] The April 25, 2007 press release (Renner Decl., Ex. D) issued by Medis does not even identify which portions of the article were misquoted.  Thus, to this day, Medis has never corrected its misstatements.  Moreover, the April 25, 2007 press release is misleading because the Company merely reaffirmed the truthfulness of the April 13, 2007 press release, which was materially false and misleading as demonstrated herein.

*Nursing Home Pension Fund 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir. 2004)*; Tellabs,* 127 S.Ct. at 2511).

In fact, Defendants have provided a plausible motive, asserting that Medis' stock was under heavy pressure from short sellers. Def. Br. p. 5.  By issuing a misleading press release and causing a sudden 25% stock price increase, those investors with short positions were squeezed (e.g. had to cover their short positions by buying Medis stock at a higher price) and suffered huge losses.  Thus, Defendants' motive may simply have been to punish the short sellers and drive them away from the stock.

### 5.    Defendants' Prior Misbehavior Supports an Inference of Scienter

It is well established that evidence of a prior bad act can be admissible under Rule 404(b) of the Federal Rules of Evidence as proof of motive, opportunity, intent … knowledge…"  Fed. R. Evid. 404(b).  Indeed, "similar prior acts may be admitted to show a pattern of operation suggestive of intent where it is in fact an issue at trial."  *See Commodity Futures Trading Com'n v. Rosenberg*, 85 F. Supp.2d 424, 437-38 (D.N.J. 2000) (admitting prior wrongdoing with third party to show intent of in present action of similar nature); *United States v. Benton,* 852 F.2d 1456, 1468 (6th Cir. 1988) ("where evidence of prior bad acts is admitted for the purpose of showing intent, the prior acts need not duplicate exactly the instant charge, but need only be sufficiently analogous to support an inference of criminal intent").[13]

Here the Complaint asserts that Defendants have regularly engaged in the practice of deception in issuing public statements.  Plaintiffs cite to the fact that defendant Lifton erroneously informed investors that there was "absolutely no legal or moral or any reason that [the PowerPack] should not be able to be brought on an airplane…"  FAC ¶ 52.  This statement, which was made on May 9, 2007, by Lifton while he was under the microscope of this pending lawsuit, was not true.  It was a violation of federal regulations to carry PowerPacks on airplanes. FAC ¶ 51-6.  Realizing that this information is probative to scienter, and taking the old adage "hiding in plain sight" to heart, on December 4, 2007 defendants submitted to the Court a copy of a December 3, 2007 press release issued by the Company that allegedly demonstrates that the

---

[13]   Prior bad acts have been held admissible to show intent in criminal fraud actions where the defendant claims that he was unaware of what was going on around him, or that his involvement with the disputed transaction was innocent or inadvertent. *United States v. Weisman,* 736 F.2d 421, 427 (7th Cir.1984); *United States v. Bice-Bey*, 701 F.2d 1086 (4th Cir.1983).

Complaint is inaccurate in this regard.  However, that press release quoting Lifton states: "We are pleased to receive this special permit from the Department of Transportation allowing passengers and crew members to carry our 24/7 Power Pack."  If it was not against federal regulations to carry PowerPacks on airplanes, then why would "special" authorization be required?  FAC ¶ 55.  Thus, this press release bolsters the assertion that Lifton lied on May 9, 2007 and encouraged people to violate federal regulations prohibiting the transport of the PowerPack, when he told investors that there is nothing legally or morally wrong in carrying PowerPacks on airplanes.  FAC ¶ 56.

Likewise, the pattern of deception is demonstrated prior to the Class Period.  FAC ¶ 57. The Complaint asserts that Defendants engaged in conduct similar to the conduct at bar, when on July 28, 2005, the Company announced it received a purchase order from an entity called ASE International for a whopping $50 million. FAC ¶ 57.   That announcement immediately goosed Medis' stock price.  That press release, however, failed to disclose that the purchase Order for $50 million was entered into with an entity controlled by Udis' father-in-law.  FAC ¶¶ 58-9. When the related party nature of the transaction was finally revealed to the market, the price of Medis securities fell.  FAC ¶ 61.  The purchase order from ASE mysteriously remains unfilled, despite the fact that Defendants admit that on June 28, 2007, the Company's high-volume production assembly line for the PowerPack has been launched.  Defs. Br. p. 5.[14]

## POINT III

### THE CONTROL PERSON CLAIMS
### ARE SUFFICENTLY ALLEGED IN THE COMPLAINT

Defendants' sole basis for moving for dismissal on the control person claims under Section 20(a) is predicated on the contention that no primary violation has been alleged against any defendant.  As a primary violation is clearly alleged, as demonstrated above, the Court must deny dismissal of this claim.

---

[14] Defendants cite to *Geopharma* assert that the Court should reject this contentions.  However, in *Geopharma* the parties did not explain why the prior misconduct related to scienter allegations made during the class period.  Moreover, Judge Scheindlin did not find the allegations compelling because plaintiffs "barely mention these allegations in their opposition brief" and the overall allegations of scienter were weak the prior bad acts were "unavailing."  *Geopharma*, 411 F. Supp.2d at 451.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss must be denied.


Dated January 28, 2008

                                                  Respectfully submitted,


                                                  **THE ROSEN LAW FIRM, P.A.**


                                                  /s/ Phillip Kim

                                                  Phillip Kim, Esq. (PK 9384)

                                                  Laurence M. Rosen, Esq. (LR 5733)

                                                  350 Fifth Avenue, Suite 5508

                                                  New York, New York 10118

                                                  Telephone: (212) 686-1060

                                                  Fax: (212) 202-3827

                                                  Email: pkim@rosenlegal.com

                                                  Email: lrosen@rosenlegal.com


                                                  Lead Counsel for Lead Plaintiffs and Class

**CERTIFICATE OF SERVICE**

I hereby certify that on this on the 28th day of January, 2008, a true and correct copy of the foregoing document, was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Phillip Kim_____