UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
MEDIS INVESTOR GROUP,                              :
                                                   :
                        Plaintiff,                 :    07 Civ. 3230 (PAC)
                                                   :
        - against -                                :    OPINION AND ORDER
                                                   :
MEDIS TECHNOLOGIES, LTD., ROBERT K.                :
LIFTON, and ANDREW UDIS,                           :
                                                   :
                        Defendants.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

This class action is brought on behalf of shareholders of Medis Technologies, Ltd. ("Medis" or the "Company") against: (1) Medis; (2) its Chief Executive Officer ("CEO") Robert K. Lifton ("Lifton"); and (3) its business development manager/marketing representative Andrew Udis ("Udis") (collectively, "Defendants"). In its First Amended Class Action Complaint ("Amended Complaint"), Plaintiff, a unit of similarly situated shareholders, alleges that Defendants either knowingly or recklessly misrepresented the true nature of Medis's initial product sales to the investing public and thereby committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiff also alleges that Defendants Lifton and Udis (the "Individual Defendants") are liable as control persons under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Defendants now move to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), alleging that Plaintiff fails to properly plead scienter. For the reasons stated below, Defendants' motion to dismiss is GRANTED.

**I. STANDARD OF REVIEW**

On a motion to dismiss for failure to state a claim, the court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1975 (2007) (citation and quotations omitted); In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007). "Legal conclusions, deductions or opinions couched as factual allegations," however, are not entitled to a "presumption of truthfulness." In re NYSE Specialists, 503 F.3d at 95 (quotation omitted). The Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citing Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)).

**II. FACTS ALLEGED IN THE AMENDED COMPLAINT[1]**

Medis is a development stage company which designs, develops, and markets a liquid fuel cell device called the 24/7 PowerPack ("PowerPack") for the mobile handset and portable consumer electronics markets.[2] (Amended Complaint ("AC") ¶ 2.) During the four-day period from April 13, 2007 through April 17, 2007 (the "Class Period"), Medis was registered with the Securities and Exchange Commission ("SEC") pursuant to the Exchange Act and was traded on the NASDAQ National Market ("NASDAQ"). (AC ¶ 19.) Lifton served as Chairman and CEO of Medis throughout the Class Period. (AC ¶ 20.) Udis served as the business development manager for Medis and has been described

---

[1] Except where specified, the facts are drawn exclusively from Plaintiff's Amended Complaint and the exhibits attached thereto and are taken as true for the purposes of this motion.
[2] According to the Company's website, the PowerPack purports to be the "world's first consumer fuel cell" power system. (¶ 17.)

in various Medis SEC filings as a "marketing representative."[3] (AC ¶ 21.)

### A. The Medis Announcements

On Friday, April 13, 2007, Medis issued a press release, and later filed a corresponding 8-K with the SEC, entitled, "MEDIS TECHNOLOGIES BEGINS COMMERCIAL SALES OF ITS FUEL CELL 24/7 POWER PACK" (the "Press Release"). (AC ¶ 34 & Ex. 1.)  It states in relevant part:

> Friday April 13, 10:02 am ET . . . MEDIS TECHNOLOGIES LTD. (NASDAQ:MDTL) announced that it has begun commercial sales of its 24/7 fuel cell Power Packs to Microsoft.  The first shipment of Microsoft branded 24/7 Power Packs were made today.
>
> "This is an historic moment for our company," said Robert K. Lifton, Chairman and CEO of Medis Technologies.  "It marks the first commercial sales of our 24/7 Power Pack product and indeed, the first commercial sales in quantities of any consumer fuel cell product.  We are pleased to be able to serve Microsoft as our first customer."

(AC ¶ 34 & Ex. 1.)  The Amended Complaint alleges that this announcement regarding the Company's lead product caused Medis's stock to rise dramatically from a previous per share closing price of $18.29 to an intraday high of $24.10 on April 13, 2007. (AC ¶ 35.)  Medis stock closed the day up $2.03 per share, or 11%, at $20.32 per share—on nearly 3.5 million shares traded. (AC ¶ 35.)  On the previous day, April 12, 2007, only about 175,000 of the Company's shares traded hands. (AC ¶ 35.)

This sudden surge in the price of Medis stock prompted several market commentators to raise questions about the Company's announcement. (AC ¶ 36.)  For instance, Herb Greenberg of Marketwatch noted in an internet column that the Medis Press Release contained no firm details about the size of the sale, its impact on profits, or Microsoft's intended use of the PowerPacks. (AC ¶ 36 & Ex. 2.)  Another investment

---

[3] According to media reports issued by David Redstone's investment newsletter "Hydrogen and Fuel Cell Investor," Lifton and Udis have been "friends for years." (¶ 21.)

research website, Citron Research, asked Medis's Deputy Chairman/Chief Operating Officer/Treasurer Howard Weingrow about the size of the Microsoft sale and for a contact person at Medis. (AC ¶¶ 38-39 & Ex. 3.)  According to Citron Research, Weingrow informed Citron that he did not have the purchase order in front of him and could not respond to such questions, despite this being the Company's "historic" first sale. (AC ¶ 39 & Ex. 3.)  The Citron Research report also noted that the "two people we spoke to in Microsoft's corporate communications did not know about th[e] press release." (AC ¶ 39 & Ex. 3.)  While Citron Research was "not fully ready to declare this a fraud yet," it explicitly questioned the veracity of the Press Release. (AC ¶ 39 & Ex. 3.)

Later that same day—and after the aforementioned skeptical analyst comments surfaced—Udis gave an exclusive interview to Dallas Kachan, the publisher and acting editor of the technology trade publication <u>Inside Greentech</u>. (AC ¶ 40 & Ex. 4.)  The resulting <u>Inside Greentech</u> online article entitled "Microsoft to Sell Fuel Cells" provided in pertinent part as follows:

> While the company wouldn't specify the quantity of the initial shipment, or of the contract's total volume, business development manager Andrew Udis told Inside Greentech the ultimate unit commitment was expected to be "in the millions."
>
> A Microsoft spokesperson would only acknowledge that the company made "a small purchase" from Medis, but Udis confirmed Microsoft intends to offer the devices to the public.
>
> "They've branded the product and plan to sell these around the world."

(AC ¶ 40 & Ex. 4.)

### B. Negative Revelations

On Tuesday, April 17, 2007, two articles appeared in the online trade publication <u>Marketwatch</u> discussing the details of the sale.  The articles quoted unnamed Microsoft

4

spokespersons, who stated that Microsoft had purchased only about $15,000 worth of PowerPacks and had no plans to resell them to the public or to develop the product at all; rather, it planned to distribute the PowerPacks for free at an unspecified upcoming event. (AC ¶¶ 42-43 & Ex. 5, 6.) One of the articles also referenced a report prepared by proxy and research firm Glass Lewis, which quoted a Microsoft spokesman as saying the Medis product was "not a Microsoft branded product." (AC ¶ 43 & Ex. 6.)

The Amended Complaint alleges that these corrective disclosures caused Medis's stock price to fall. On April 18, 2007, the Company's stock closed at $17.97 per share, down $1.53 per share on over 1,132,000 shares traded. (AC ¶ 65.) This downward slide continued, with the share price falling an additional $0.55 per share at the end of trading on April 20, 2007 for a total decline of $2.08 per share over the three-day period starting April 18, 2007. (AC ¶ 65.)

On April 19, 2007, Kachan posted an online addendum to his Inside Greentech article (the "Addendum"), which stated that "a Medis executive, upon seeing our article, called Inside Greentech to suggest the Microsoft order was substantially smaller in size than what the company's spokesperson had told us." (Affidavit of Deborah Renner ("Renner Aff."), Ex. C.)[4] It noted specifically that the Medis executive did not address whether the PowerPacks were intended for resale, despite the report in Marketwatch that

---

[4] The Addendum appeared beneath the original text first posted on April 13, 2008. Though the Addendum is not quoted in the Amended Complaint or included in the version of the Inside Greentech article attached to the Amended Complaint, it was added to the online version of the article on April 19, 2007—four days before this action commenced on April 23, 2007. Thus, the Addendum was part of the article as it existed when Plaintiff filed this action. Since Plaintiff has incorporated this article by reference, the Court may consider all portions thereof existing at the time of filing, including the Addendum, without converting this action into a motion for summary judgment. See In re AstraZeneca Sec. Litig., --- F.Supp.2d ---, ---, No. 05 Civ. 2688 (TPG), 2008 WL 2332325, at *4 (S.D.N.Y. June 3, 2008) ("Since plaintiffs have referred to the . . . press release in the complaint, the Court may consider all portions of the document . . . without converting the motion into a motion for summary judgment."); see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

5

they were intended as giveaways. (Id.)  The Addendum is silent as to whether Microsoft had branded the PowerPacks, nor is there any indication as to when the unnamed Medis representative contacted the website.[5] (Id.)

### III.  DISCUSSION

Defendants only challenge the sufficiency of Plaintiff's factual allegations with respect to scienter.  The Court assumes that Plaintiff has properly pled the other elements of its securities fraud claim and addresses only the question of whether scienter has been adequately pleaded with regard to both Medis under Section 10(b) and Rule 10b-5 and the Individual Defendants as control persons under Section 20(a).

### A.  Scienter Pleading Requirements

In order to establish liability for securities fraud under Section 10(b) and Rule 10b-5, the plaintiff must prove, inter alia, that the defendant acted with scienter, defined in the Second Circuit as "intent to deceive, manipulate, or defraud, or reckless conduct." ATSI, 493 F.3d at 99 n.3 (internal quotation and citations omitted).  As with the other elements of a 10(b) claim, allegations regarding scienter must be stated with particularity, and, pursuant to the Private Securities Litigation Reform Act, the plaintiff must allege "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).  Indeed, it is not enough "that a reasonable factfinder

---

[5] The full text of the Addendum reads:
> This week, Microsoft started asserting to the media that it has only ordered a small quantity of Medis' fuel cells as trade show giveaways.
> This flies in the face of what we were told by Medis itself, as quoted above, which, when specifically asked, emphatically maintained that Microsoft was ordering these in large quantities ("millions," he said) for resale.
> As the one who performed the interview with Medis, let me confirm that this is indeed what we were told by the company.
> Also for the record, a Medis executive, upon seeing our article, called Inside Greentech to suggest the Microsoft order was substantially smaller in size than what the company's spokesperson had told us.  No contrary numbers were given.  Nor was any suggestion made that these products weren't intended for resale.

(Renner Aff., Ex. C.)

6

plausibly could infer from the complaint's allegations the requisite state of mind." Tellabs, Inc. v. Makor Issues & Rights, Ltd., --- U.S. ---, 127 S.Ct. 2499, 2504 (2007). Instead, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent" in order to survive a motion to dismiss. Id. at 2504-05.

In order to determine whether a complaint has adequately pleaded scienter, a court should examine all of the facts alleged collectively or "holistically" (without parsing individual allegations), and take into account any inference concerning scienter—supporting or opposing—which can be drawn from the complaint. See id. at 2509.  Once it has considered the complaint in this light, the court should find that scienter has been adequately pleaded only if a "cogent and compelling" inference regarding the requisite state of mind can be drawn. Id. at 2509-10.  According to the Supreme Court, the critical inquiry is: "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 2511.  If so, then scienter has been adequately pleaded.  If not, the case may be dismissed.

The plaintiff may plead a "strong inference" of scienter "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99 (citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 168-69 (2d Cir. 2000)).  Here, Plaintiff pleads the latter, alleging that Lifton and Udis, as senior officers and/or agents of Medis, had access to accurate information and data such that they knew, or were reckless in not knowing, that their statements to the media and investing public

7

regarding the PowerPack sale were materially false or misleading. (AC ¶¶ 74-75.) Specifically, Plaintiff alleges that Defendants' scienter is evidenced by their failure to disclose their knowledge that: (1) Medis did not produce "Microsoft-branded" PowerPacks for sale to Microsoft; (2) the unit commitment from Microsoft did not exceed $15,000, contrary to Udis's claims of expected sales in the millions; and (3) Microsoft intended only to distribute the PowerPacks for free, rather than resell the PowerPacks to consumers. (AC ¶¶ 46-49, 64.)[6]

Where the plaintiff pleads scienter by conscious misbehavior or recklessness rather than motive, "the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quotation omitted); see also In re Bayou Hedge Fund Litig., 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (noting that "the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, and the inference of recklessness must be at least as compelling as any opposing inferences."). Recklessness is defined as conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit, 264 F.3d at 142 (quotation omitted). To properly allege recklessness, the plaintiff must plead "a state of mind approximating actual intent, and not merely a heightened form of negligence." Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000) (quotation and citation omitted); see

---

[6] The Amended Complaint can be read to allege motive, but only with respect to Udis: "His compensation was directly tied to the Company's sales. Udis is entitled to 1% of the actual completed sales on his accounts. Thus, Udis was fully aware of the terms of the Microsoft sale when he made his statements to Greentech." (AC ¶ 50.) The Court will disregard this allegation in light of: (1) Plaintiff's concession that it is not pursuing its theory of scienter on motive and opportunity (Lead Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") 16 n.8 & 17 n.9); and (2) counsel's statement at oral argument on July 16, 2008: "No, we don't allege motive. We don't allege motive" (Transcript of Oral Argument dated July 16, 2008 (Tr.) at 23:11-12.).

8

also In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) ("Recklessness in the scienter context cannot be merely enhanced negligence."). Recklessness is often shown when the plaintiff alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate . . . or . . . failed to check information they had a duty to monitor." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (quoting Novak, 216 F.3d at 311).

### B. Control Person Liability:  Section 20(a)

In order to plead a prima facie case of control person liability under Section 20(a) of the Exchange Act, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI, 493 F.3d at 108. Accord SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996); Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 246-47 (S.D.N.Y. 2006).

### C. Analysis

Plaintiff asserts that Medis's statements of April 13, 2007 were materially false and misleading because:  (1) Microsoft had no plans to sell Medis's PowerPacks around the world—let alone to any consumer—and planned only to distribute them as a free giveaway at an upcoming event; (2) Microsoft in fact purchased only $15,000-worth of PowerPacks; (3) Microsoft did not plan to establish an original equipment manufacturer ("OEM") relationship or any other type of ongoing arrangement with Medis; and (4) the PowerPacks did not carry the Microsoft brand. (AC ¶ 42.)  The gravamen of Plaintiff's

9

allegations is that Medis's statements improperly suggest a promising and potentially lucrative relationship with industry giant Microsoft, whose brand name and reputation would stand behind the quality and reliability of the PowerPacks. (AC ¶¶ 46-48.) A closer look at the allegations, however, reveals that Plaintiff fails to adduce the strong and particularized circumstantial evidence of Defendants' recklessness necessary to survive a motion to dismiss.

### 1. The Press Release

Though Plaintiff clearly seeks to recast the Press Release and Inside Greentech article as something of a reckless two-step—a devious whole greater than the sum of its perhaps benign parts—there are very real evidentiary shortcomings undermining the allegations as to each statement. First, excepting the branding comments, which are addressed below, it is not obvious from Plaintiff's allegations exactly which statements in the Press Release were false or misleading. Plaintiffs take specific issue with Medis's statements that it had: (1) "begun commercial sales;" (2) made its "first shipment" of PowerPacks; (3) achieved an "historic moment;" and (4) made the "first commercial sales in quantities of any consumer fuel cell product." (AC ¶¶ 34-35, 44.) These statements convey exactly what Medis intended—that the sale of PowerPacks to Microsoft represented a landmark achievement both for Medis and the fuel cell industry—and none of these statements have been contradicted by Microsoft or anyone else. Microsoft even acknowledged its purchase of PowerPacks in the two Mediawatch articles cited by Plaintiff. (See AC ¶ 42 ("The Microsoft spokeswoman said only that a 'small amount' of the chargers was purchased . . . ."), ¶ 43 ("A Microsoft spokesman, noting that the order

10

was 'small' . . . .").).) Absent any other contradictory evidence, the Court takes these statements to be true.

That leaves only the statements regarding branding. Plaintiff wants the Court to infer that, by stating that the PowerPacks bore the Microsoft brand, Medis conveyed a message of massive commercial resale, and attacks the Press Release on that basis. The Amended Complaint is completely silent, however, as to what, if anything, was actually superimposed on the PowerPacks themselves—i.e., did the PowerPacks carry Microsoft's distinctive four-square "Windows" logo, or its black, impact, italicized "Microsoft" logo or, in fact, no mark at all? Instead, all we have are the statements of an unnamed, unidentified Microsoft spokesperson quoted in a third-party news source that the "Medis product is 'not a Microsoft branded product.'" (AC ¶ 43.) At oral argument, counsel for Plaintiff appeared to concede the presence of some sort of Microsoft mark by failing to contest Defendants' counsel's claim that the PowerPacks bore Microsoft's name. (See Transcript of Oral Argument dated July 16, 2008 ("Tr.") at 4, 28-29.) Roget's International Thesaurus includes "brand" and "logo" in the following list of synonyms: "label," "tag," "stamp," "seal," "trademark." Roget's International Thesaurus 517.13 (Barbara Ann Kipfer, ed., 6th ed. 2001). While Plaintiff suggests "a material difference between Microsoft branding and reselling the PowerPacks under [its] brand name and . . . giving away the PowerPacks for free at trade shows with [its] logo on them" (Lead Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") 8), the distinction between "brand" and "logo" is too nuanced to raise a compelling inference of scienter by recklessness. Indeed, Plaintiff's counsel recognized this deficiency at oral argument, noting with regard to the branding comment, "It was sort of like a small kind of

11

misleading kind of close to a gray area." (Tr. 29.)  Where compelling circumstantial evidence is required, isolated gray areas are plainly insufficient.

      Moreover, to the extent Plaintiff's scienter allegations regarding the Press Release focus on the Defendants' nondisclosure of additional details regarding the Microsoft sale, Plaintiff fails to explain why Medis had an obligation to say something more. (AC ¶ 44.)  A defendant's "failure to disclose particular information, by itself, can only constitute recklessness if there was an <u>obvious</u> duty to disclose that information." <u>In re GeoPharma, Inc. Sec. Litig.</u>, 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006) (emphasis added) (citing <u>Kalnit</u>, 264 F.3d at 143 (when duty to disclose letter was unclear, "defendants' recklessness cannot be inferred from the failure to disclose")).  This ensures that fraudulent intent cannot be imputed to a company every time a public statement lacks detail. <u>See</u> <u>Bragger v. Trinity Capital Enter. Corp.</u>, No. 92 Civ. 2124 (LMM), 1994 WL 75239, at *4 (S.D.N.Y. Mar. 7, 1994) (holding that Rule 10b-5 cannot be stretched to compel disclosure of "any and all material information about the entity").  Here, the Press Release was designed to inform the public that Medis had made the first shipment and sale in the history of both the Company and the fuel cell industry. (Defs.' Mem of Law in Support of Mot. to Dismiss 1st Am. Class Action Compl. ("Defs.' Mem.") 21.)  Though perhaps the investing public may have gained additional insight had the Press Release mentioned that it was a one-time sale with a purchase order for $15,000, the non-disclosure of this information did not make anything in the actual Press Release false or misleading.  Indeed, it appears that the limited scope of the information in the Press Release was motivated by Company policy.  As Lifton explained in an earnings call transcript attached to the Amended Complaint, Medis's customers "instructed [Medis]

12

. . . unequivocally not to present the number of units that they buy and not to present the amounts of dollars that they pay per unit." (Am. Compl., Ex. 7, Q1 2007 Earnings Call dated May 9, 2007, at 4.)  Plaintiff never explains why taking such a tack with regard to sensitive sales information is reckless.  The limited allegations on offer do not suggest that Medis was negligent, let alone reckless, in drafting and disseminating the information in the Press Release.

### 2. Inside Greentech Article

Next, the Court turns to the statements purportedly made by Udis and reported by Inside Greentech.  Plaintiff seeks to raise an inference that, once the media began to question the significance of the Press Release, Medis quickly put Udis to the task of disseminating false and/or misleading information in order to quell the analysts and maintain the surge in Medis's share value.  Plaintiff fails to identify, however, a document or report to which Udis had access that contradicted his alleged misrepresentations concerning the PowerPack sale.

Typically, in order to raise an inference of conscious misbehavior or recklessness, the plaintiff must "specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements." Novak, 216 F.3d at 308.  This obligates the plaintiff to "identify the reports or statements containing this information." Id. at 309.  Here, Plaintiff never identifies an invoice, purchase order, or contract that might have put Udis on notice that, for instance, the sale was substantially smaller than he claimed.  Instead, Plaintiff relies solely on its conclusory allegation that Udis "had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations and sales at all relevant

13

times." (AC ¶ 74.) In the usual case, allegations premised solely upon the person's corporate title are insufficient to establish scienter. See In re Dynex Capital, Inc. Sec. Litig., No. 05 Civ. 1897 (HB), 2006 WL 314524, at *8 (S.D.N.Y. Feb. 10, 2006), vacated in part on other grounds by Teamsters Local 445, 531 F.3d 190; In re Aegon N.V. Sec. Litig., No. 03 Civ. 603 (RWS), 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) (noting that allegations that plaintiffs had access to adverse undisclosed information because of their positions with the company are insufficient to establish scienter). However, the failure to allege access to specific reports or data containing contradictory information is not necessarily fatal to Plaintiff's claim.

Plaintiff cites Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989) for the proposition that, where alleged misstatements concern information critical to the core function of a business, knowledge of such information is properly attributable to the company and its senior executives. See id. at 13. In Cosmas, the defendant directors of Inflight Services, Inc. misrepresented to investors that sales to China "were to represent a significant part of Inflight's business." Id. The plaintiffs alleged conscious misbehavior or recklessness by noting that, at the time these statements were made, China had imposed significant import restrictions that would restrict Inflight's sales to Chinese customers. Id. at 10. The Second Circuit concluded that the plaintiffs had adequately pleaded scienter, because:

> [T]he amended complaint alleges facts from which one can reasonably infer that sales to [China] were to represent a significant part of Inflight's business. These facts give rise to a strong inference that the [defendant directors] had knowledge of [China's] import restrictions, since the restrictions apparently eliminated a potentially significant source of income for the company.

14

Id. at 13. Thus, a plaintiff need not identify specific reports or data containing contradictory information when the defendant's misstatements pertain to subject-matter critical to key corporate functions.

In In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266 (S.D.N.Y. 2006), the court questioned the continued validity of the "core operations" method of pleading scienter, stating, "Cosmas precedes the PSLRA by six years, and post-PSLRA decisions in other Circuits have cast doubt on whether scienter can be pleaded in this manner." Id. at 294 n.209 (citing Rosenzweig v. Azurix Corp., 332 F.3d 854, 867 (5th Cir. 2003) and In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 848 (9th Cir. 2003)). Nevertheless, several courts have denied post-PSLRA motions to dismiss based on similar allegations of scienter. See, e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) ("Acquiring and hiring out cargo planes pursuant to ACMI contracts are the activities that constitute the core operations of Atlas Air. Knowledge of market conditions that substantially affect these core operations and the financial reporting of them may be imputed to key officers within the company."); In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (finding that the alleged fraudulent statements related to the core business of the corporation); Epstein v. Itron, Inc., 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) ("[F]acts critical to a business's core operations or an important transaction are generally so apparent that their knowledge may be attributed to the company and its key officers."), abrogated on other grounds by In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999). In addition, even where "core operations" allegations have been deemed insufficient, courts still have applied Cosmas but dismissed for the plaintiff's failure to establish that the alleged fraud

concerned a vital corporate function. See, e.g., In re eSpeed, 457 F. Supp. 2d at 294 ("[T]he Complaint is inadequate . . . because it does not allege that PI was so vital to eSpeed that its top officers must have known of the extent of PI's failure."); In re JP Morgan Chase, 363 F. Supp. 2d at 628 (declining to apply "core operations" doctrine when plaintiffs allege no facts suggesting that alleged fraudulent accounting "was at the core of JPM Chase's business"); In re Federated Dep't Stores Sec. Litig., No. 00 Civ. 6362 (RCC), 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004) (holding that because misrepresentations concerned "one financial factor of a subsidiary representing approximately 10% of [subsidiary's] total assets," and this factor was "not essential to the survival" of the company, knowledge of fraud could not be imputed to defendants.).

It appears beyond dispute that the development and sale of the PowerPack product was critical to the long term viability of Medis. Though the Amended Complaint does not specify what percentage of the Company's overall spending was allocated specifically to PowerPack product development, it describes Medis as being "primarily in the business of developing" the PowerPack (AC ¶ 2), a point that Defendants do not contest. It appears Medis chose to describe its sale of PowerPacks to Microsoft as "an historic moment" (AC ¶ 34 & Ex. 1) because it signified Medis's transformation from a "development stage" (AC ¶ 2) to a revenue-generating company. Indeed, in their supporting memorandum, Defendants state that the mere fact of the sale was significant because it marked the first-ever commercial sale of a fuel cell product and posit that the Press Release was "akin to an announcement such as 'Wright Brothers Fly Plane.'" (Defs.' Mem. 2.) Thus, information about the sale—including the size of the order, the

16

scope of the business relationship with Microsoft, and the branding of the product—is properly attributable to top-level Medis executives.

Yet, it remains unclear whether Udis is the type of top executive to which such information is ascribable. Unlike Lifton, Medis's Chairman and CEO, Udis does not have an official corporate title; he is described in the Amended Complaint as the Company's "business development manager." (AC ¶ 21.) For support, Plaintiff cites only a press release styled as a letter to the Company's shareholders, attached as an exhibit to a Form 8-K, in which Lifton recounts Medis's marketing efforts in Asia and identifies Udis as having traveled there in his capacity as "our marketing representative." Medis Technologies Ltd., Current Report (Form 8-K), Ex. 99.1 (June 1, 2006). This generic description of Udis's role stands in stark contrast, however, to Lifton's description in the same paragraph of other Medis executives, "Jacob Weiss, our President and Gennadi Finkelshtain, our CTO."[7] Id. Other than a third-party representation that Udis and Lifton have been "friends for years" (AC ¶ 21), there is nothing else by which the Court can infer that Udis was a top corporate insider such that unspecified contradictory information concerning PowerPack sales is ascribable to him. Clearly, not everyone who makes statements to the investing public is a senior executive.

In the absence of any specific countervailing information regarding the extent of the Medis-Microsoft sale, the Court has no context by which to gauge the reasonableness of Udis's statements. Indeed, one might infer that Udis's optimism was justified by the

---

[7] The Court reads the 8-K to suggest that Udis, as the marketing representative, had only limited authority to bind the Company in deals with potential customers. It was left to Weiss and Finkelshtain to meet with companies and government officials in Asia to "follow upon" the groundwork set by Udis in his earlier visits there. See Medis, 8-K, Ex. 99.1 (June 1, 2006). If Udis could have spoken for the Company on his own, there would have been little need to send higher-ranking executives to discuss distribution and purchasing.

significance of the sale itself: his friend's corporation, after years of development and promise, had finally announced the first-ever shipment of a fuel cell product to any commercial customer, let alone Microsoft. Perhaps Medis and Microsoft had engaged in earlier negotiations to which Udis had been privy in which the possibility of a more significant sales partnership was discussed. Perhaps Udis, out on sales calls, had never been told that the sale to Microsoft had been significantly scaled back. The point is: the Court does not know because Plaintiff provides no context. Thus, absent specific allegations that Udis had access to contradictory information, Plaintiff fails to raise a strong inference that Udis's comments to Inside Greentech regarding the PowerPack sale were reckless. See Teamsters Local 445, 531 F.3d at 196.

This conclusion is further buttressed by Medis's actions in the wake of the Inside Greentech article's release. As evidenced by the Addendum to the article posted on April 19, 2007, Medis promptly contacted the author of the article in an attempt to correct the record. (Renner Aff., Ex. C.) Even though, by taking this action, Medis essentially acknowledged that Udis's statements were inaccurate, it also raised an inference that Medis did not concoct a plan to artificially inflate its share value for any prolonged period of time. See In re GeoPharma, 411 F. Supp. 2d at 448 ("[I]t is difficult to find strong circumstantial evidence of recklessness, especially when GeoPharma promptly issued a new press release, and scheduled a conference call, once the confusion caused by the December 1 Release became apparent.").

### 3. Implausibility

Though Plaintiff admittedly seeks to establish scienter by recklessness, the overall implausibility of the purported scheme is still relevant to the present discussion. See id. at

18

446 n.83 ("Courts often refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations."). Plaintiff posits that, "[b]y issuing a misleading press release and causing a sudden 25% stock price increase, those investors with short positions were squeezed . . . and suffered huge losses." (Pl.'s Opp'n 23.) This contention lacks any support, however, in either the record or the relevant case law, and appears to defy common sense. It would mean that Defendants consciously disseminated false information to that segment of the investing public with the most to gain by ferreting out any inaccuracies in their statements. Given the underlying significance of the announcement—the first-ever commercial sale of fuel cell technology—they would have known that the short-sellers, as well as analysts and even Microsoft itself, would easily expose the fraud. Once the negative revelations came to light, the overall effect would be to deflate Medis's share values below even their April 13, 2007 listings, ultimately giving the short-sellers exactly what they always want: a lower price. Of course, that is exactly what actually transpired: Medis shares lost 5% of their value from the date of the Press Release to April 20, 2007. It is even more unrealistic to suggest that Medis would co-opt the biggest announcement in the history of the Company to achieve that goal.

### 4. Conclusion

Considering <u>all</u> of the facts alleged, the lack of any facts to support the contention that Defendants knowingly made false statements, the absence of specific facts showing that Defendants had access to information contradicting their public statements, and the overall implausibility of the suggested scheme, Plaintiffs have not alleged "strong circumstantial evidence of conscious misbehavior or recklessness." <u>ATSI</u>, 493 F.3d. at 99. In light of these evidentiary shortcomings, the Amended Complaint fails to raise a

19

strong inference of scienter by recklessness so as to satisfy the heightened pleading requirements of the PSLRA as interpreted by the Supreme Court in <u>Tellabs</u>. The Court finds the inference of recklessness alleged by Plaintiff—that Defendants knew or should have known that Medis's statements of April 13, 2007 were false and/or misleading—is less compelling than an opposing inference—that any inaccuracy was, at best, a product of Defendants' negligence. Since Plaintiff fails to plead a primary violation under Section 10(b), the Section 20(a) control person claims against the Individual Defendants must also be dismissed. <u>ATSI</u>, 493 F.3d at 108 ("To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person . . . ."); <u>see also</u> <u>In re Bayou Hedge</u>, 534 F. Supp. 2d at 418 (dismissing claims against individual defendants upon finding no primary violation).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is GRANTED. The Clerk of Court is directed to terminate this motion and close this case.

Dated: New York, New York
August 18, 2008

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge